PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* PEDRO RAMÍREZ, Defendant and Appellant.

No. 5877. Argued May 19, 1936.—Decided June 26, 1936.

*Juan B. García Méndez* for appellant. *R. A. Gómez, Prosecuting Attorney,* for appellee.

Mr. Justice Travieso delivered the opinion of the Court.

The appellant was charged before the District Court of Mayagüez with having killed Rafael Vives Nazario on the first day of May in 1934, under circumstances which the prosecuting attorney thought sufficient to classify the act as a crime of murder in the first degree. It is alleged in the information that the defendant fired several shots from a revolver at his victim, inflicting a wound in his back, as a direct consequence of which he died almost immediately.

The defendant was arraigned on the 28th of May, 1934. He was granted until June 1, 1934, to plead, on which date he entered a plea of not guilty and asked for a trial by jury.

On July 3, 1934, the defendant appeared by his new counsel, Manuel A. García Méndez, and filed a motion asking that the information be made more certain as to the number of bullet wounds inflicted upon the deceased, places in which they were inflicted and the course thereof; and the number of shots which it is alleged were fired by the defendant. On the 6th of the same month this motion was overruled and on the 19th the defendant filed his exception.

On July 20, 1934, the defendant, through his counsel J. B. García Méndez, who stated that he was acting in representation of Manuel A. García Méndez, attorney for the defendant, asked that the hearing of the case which had been set for July 23, 1934, be continued stating:

1. That Manuel A. García Méndez, counsel for the defendant, had been obliged to leave the island on account of his health, upon advice of his plysician, who so certified; and that he would not

return until the month of September or the first ten days of October, 1934.

2. That at the time when the aforesaid attorney left the island, the case had no been set for trial, and the said attorney had the following reasons for believing that the case would not be set until after the month of September: (*a*) because the month of July is not ordinarily devoted by the District Court of Mayagüez for the hearing of jury cases; (*b*) because August and September are vacation months for such court; (*c*) for the reason that such a short interval had elapsed since the commission of the alleged offense and so many other cases had been filed prior to the instant case that the attorneys believed that this case would be called in its order on the docket and would not be set for the month of July.

3. That since this is a case of murder, it would not be possible for the defendant to secure another attorney who could properly defend him, since there is insufficient time to prepare his defense, the defendant being thus without counsel.

4. That the only attorney for the defendant was Manuel A. García Méndez, and that J. B. García Méndez, the signer of the motion, is not acquainted with the facts of the case, or with the question of law to be raised; that this last-mentioned attorney has devoted himself to the handling of civil matters only, and is lacking experience in criminal matters, while the other attorney has specialized in such practice.

Together with the motion there were presented a doctor's certificate and an affidavit of merits signed by the defendant.

On July 21, 1934, the court ordered the continuance of the trial and set it again for August 7, 1934, at the same time ordering the clerk of the court to publish the proper notices, announcing a special term to commence on the aforesaid day of August 7, 1934.

On July 31, 1934, the defendant by his counsel J. B. García Méndez, petitioned the District Court to order the drawing and the citation of the jurors to hear the case, as is provided in Rule 6 of the court which reads:

"RULE 6.—As soon as an order setting a day for jury trials has been entered, the court shall order that the jurors be selected and summoned in the form prescribed in the Code of Criminal Procedure,

to appear as such jurors at 9 a, m. on the day fixed for the trial of the cases on such docket.''

On August 7, 1934, the court, after hearing both parties, overruled the motion that the jurors be drawn and summoned.

During the hearing of the case held on August 8, 9 and 10, 1934, the defendant was represented by his counsels Rafael Martínez Nadal, Juan B. García Méndez and Amador Ramírez Silva.

When the information was read to the defendant, he ratified through counsel, his plea of not guilty, the court then ordered the drawing of the jury and held the trial.

On August 10, 1934, the jury returned a verdict finding the defendant guilty of murder in the second degree. On September 20, 1934 the defendant filed a motion for a new trial, which was overruled by order entered on December 12, 1934. On the 19th of the same month, the court entered judgment sentencing the defendant to imprisonment for twelve years in the penitentiary at hard labor. On the same date the defendant appealed to this Supreme Court from the denial of the new trial and from the judgment.

This appeal is based upon the alleged commission by the lower court of fourteen separate errors, each one of which, appellant maintains, is of sufficient importance to warrant the reversal of the judgment for which he prays.

We shall now proceed to examine and decide the alleged fourteen errors, following the same order in which they are set forth in appellant's brief.

1st and 2nd.—That the lower erred and abused its discretion in denying the petition of the defendant for more particulars as to the information; that it likewise erred in deciding such petition without hearing the defendant and after hearing only the prosecuting attorney.

 The information in this case alleges that the defendant:

''. . . assaulted and battered by firing several shots with a revolver loaded with powder and shot, which is a mortal weapon, at the ░░░.

human being Rafael Vives Nazario, known as the Gallego, inflicting upon him a bullet wound in the back at the level of the tenth rib, penetrating the pleura, causing a profuse hemorrhage, perforating the lower lobe of the lung, lacerating the upper pole of the spleen and the greater curvature of the stomach and penetrating again in the thorax penetrated the pericardium and the right ventricle of the heart, areolar tissue of the anterior mediastium and sternum, lodging beneath the skin, and as a direct consequence of this wound, the said Rafael Vives Nazario died immediately.''

The appellant complains of the fact that the court below refused to order the prosecuting attorney to specify in the information how many bullet wounds the deceased received, the place and path thereof, and in addition the number of shots which it is averred were fired by the defendant.

In order to determine whether the alleged error, if it should have been committed, is of such nature and importance that we must consider it as prejudicial to the substantial rights of the defendant, we shall first examine the sufficiency of the information in the form in which it was presented and we then shall see whether the particulars which the defendant asked for were really necessary for his proper defense.

Our Code of Criminal Procedure (ed. 1935) provides:

''Section 82.—The information is sufficient if it can be understood therefrom:

''1. * * * * * * *

''6. That the act or omission charged as the offence is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to known what is intended.

''7. That the act or omission charged as the offense, is stated with such a degree of certainty as to enable the court to pronounce judgment upon a conviction, according to the right of the case.

''Section 83.—No information is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not tend to the prejudice of the rights of the defendant upon its merits.''

Examined in the light of the provisions of law just quoted, the information in the instant case is complete and sufficient. In ordinary and concise language the defendant is informed that the crime with which he is charged is that of having assaulted and battered the human being Rafael Vives Nazario, with a revolver; and unlawfully and willfully, with malice aforethought, and with the firm and premeditated intention of causing his death, to have fired several shots at him, one of which inflicted upon him such a serious wound that it caused his immediate death. The prosecuting attorney was not bound to describe as minutely as he did the wound which caused the death of Rafael Vives Nazario. Let us see the authorities:

"While at common law great particularity in the description of the wound is deemed to be essential, where possible, and its length, breadth, and depth, if incised, should be stated, under the modern statutes of criminal procedure such particularity is unnecessary. And in some jurisdictions, no description of the wound is required. So as a general rule it is not now essential to state its length, breadth, and depth, since it may be rejected as surplusage, an apparent repugnancy in the description of the wound is not fatal . . .

"In all indictment in which death is charged to have resulted from a stroke or blow, there must be an averment that the wound inflicted by the stroke was mortal and that death resulted therefrom. It is not necessary to show that the wound was of a character likely to produce death, but it is sufficient to allege that it was a mortal wound, and caused the death of the party. While the term 'mortal' has been held indispensable, it has, on the other hand, been held sufficient to allege that the deceased died from wound inflicted, and that the use of the word 'mortal' is not imperative. C. J. secs. 293, 294, vol. 30, p. 105.

"According to the strict-common-law rule it is essential that the indictment shall state upon what part of the body the wound causing the death was inflicted, any repugnancy being fatal, but such particularity is not in most jurisdictions now essential, it being held in many cases sufficient to charge that it was 'on the body.' " C. J. sec. 295 vol. 30, p. 105.

In the case of *People* v. *Steventon,* 9 Cal. 274, the defendant filed a demurrer in which he contended that the information was insufficient because it failed to set forth the portions of the body in which the wounds were inflicted. The court in sustaining the sufficiency of the information, said:

"The objection that the indictment does not state the length and depth of the wound, nor in what part of the body it was inflicted, goes to the form rather than the substance of the indictment. Formerly, at common law, such a description was held to be necessary, though it was not necessary that it should be proven as charged, but in later cases this rule has been changed . . .

"The 'facts necessary to constitute the crime' of murder are, that a wound is inflicted with a felonious intent, that it is mortal, and that death ensued from the effects of the wound within a year and a day after its infliction."

The same question was raised before the Supreme Court of California in *People* v. *King,* 27 Cal. 507, and that court expressed itself as follows:

"Under the pretense of informing the defendant of the nature of the charge against which he was called upon to defend, it was necessary, at the ancient common law, to describe the means by which the homicide was committed, and the nature and extent of the wound and its precise locality; from which it necessarily followed that a trifling variance between the proof and the allegation frequently defeated a conviction, no matter how manifest the guilt of the defendant. It was a long time before legislators and judges discovered that this rule had nothing but the most flimsy pretext to support it. If the defendant is guilty, he stands in need of no information to be derived from a perusal of the indictment, as to the means used by him in committing the act or the manner in which it was done, for as to both his own knowledge is quite as reliable as any statements contained in the indictment. If he is not guilty, the information could not aid in the preparation of his defense . . .

"The indictment is not bad because it does not allege that James Duffy was a human being, nor that he had a body, nor the part of his body upon which the wound was inflicted."

The granting of a bill of particulars in a criminal case is not an absolute right of the defendant. It depends upon

the sound discretion of the court before which the trial is to be had. There is no procedural provision whatever in our law which compels the court to order the prosecuting attorney to give the defendant a bill of particulars; but the court may, in the exercise of its discretion, enter such an order, but the power to do so does not depend upon an express statutory authority, but is comprised within the general power which courts possess to regulate trial procedure and due compliance with law. Since what is involved is a discretionary power of the court, the order may not be reversed unless the circumstances of the case show clearly that the court abused its discretion and that the lack of a bill of particulars prevented the defendant from preparing properly his defense.

This Supreme Court had under its consideration the case of *People* v. *Piñero,* 31 P.R.R. 1, in which the defendant filed a sworn petition asking that the prosecuting attorney furnish him with a bill of particulars. It was charged that the defendant, a motorman of an electric car, "at a time when he was driving a car in an unlawful manner and willfully and through failure to use due care and caution ran over a child, causing his death." The court below overruled the petition. This Court reversed the judgment stating:

"The appellant alleges that although that is the general rule when the definition of the crime is given in generic terms, yet in this case where failure to act with caution and prudence may have been due to different acts or omissions, the information should be more specific and set forth the act or omissions involved in such failure in order that the defendant may prepare his defense. The same question was raised in the case of *People* v. *Parkhurst,* 29 P.R.R. 856, and it was there said, in considering an information similar to this, that the defect, if any, was one of form to be reached by a bill of particulars, citing the cases of *Smith* v. *State,* 115 N. E. (Ind.) 943; *Reams* v. *State,* 100 S. E. (Ga.) 230, and *State* v. *Sartino,* 115 S. W. (Mo.) 1015. Reference was made also to the case of *People* v. *Moreno,* 28 P.R.R. 96, in which the information was identical to the one presented in this case, and it having been alleged that it failed to charge a public offense because the acts of negligence or careless-

ness had not been specified, this Court held that when negligence is alleged in general terms and the circumstances under which such negligence appears are set forth, failure to specify the particular nature of the negligence, if a defect, is one of form, and that the defendant would have been entitled to a bill of particulars if he had moved for it. In the cases of *Coffin* v. *United States*, 156 U .S. 452; *Rosen* v. *United States*, 161 U. S. 34; *Dunlap* v. *United States*, 165 U. S. 490, an *Kirby* v. *United States*, 174 U. S. 64, it was said that when the defendant desires knowledge of the facts in order to prepare his defense, he should move the court for a bill or particulars before the trial; and in the notes to *State* v. *Lewis*, Am. Ann. Cas. 1913A. 1207, this question is considered at length, citing decisions according to which the right to a bill of particulars is not absolute, but within the discretion of the court, and that a refusal to sustain a motion therefor will be reversed only when an abuse of such discretion is shown.

''In this case the defendant moved for a bill of particulars and it was denied. In support of his application the defendant merely said that he could not prepare his defense without knowing the facts, acts or omissions charged as unlawful, or constituting lack of due caution and prudence. He should have been more explicit in order to convince the court that otherwise it would be impossible or difficult for him to prepare his defense, and for that reason we are reluctant to hold the court abused its discretion in overruling the motion; but our examination of the evidence shows that in fact the act charged could have occurred in several different ways, for some witnesses testified that the defendant was running the electric car at great speed; others that he gave no signal with the bell, and others that the headlight of the car was off and that he was not watching the track because he was distracted in loking at some girls who were passing along the right sidewalk of the street. All this convinces us that, in furtherance of justice and in the exercise of our general power, we should reverse the judgment appealed from and remand the case with instructions to grant the motion for a bill of particulars.''

See *People* v. *Pacheco*, 33 P.R.R. 217; *People* v. *Gerardino*, 37 P.R.R. 173, and *People* v. *Colón*, 37 P.R.R. 225.

The information in the instant case is in conformity with the statute. It sets forth all the elements constituting a crime of murder in the first degree, and certainly a demurrer attacking its sufficiency would not have prospered.

The prosecuting attorney, without being bound to do so, gave the defendant ample details and particulars as to the wound which, as is averred in the information itself, caused the death of Rafael Vives Nazario. We do not see how the defendant could have been prejudiced through failure to give him before trial of the case a more or less detailed description of other wounds which the deceased might have received and which had not been the direct cause of his death; or through failure to inform him beforehand as to the number of shots which were alleged to have been fired by him. If the defendant was not guilty of Vives' death, the proof of his innocence would not depend in any way upon the greater or less number of wounds or the place or path thereof or upon the number of shots fired by the defendant at his victim. And if he was guilty, as the jury has found, he better than anyone ought to have known how many shots he fired and how many of them found their mark in the body of the deceased.

We have made a careful examination of the testimony of the only medical expert who testified as to the wounds found in the body of the deceased. According to his testimony there were three bullet wounds and one scratch. Two of the wounds, that inflicted in the epigastric region and that in the right forearm, were not of any importance; nor were they given any importance in the cross-examination of the medical expert by counsel for the defendant. The other wound, that which caused Vives, death, was described with great detail in the information. The export testimony as to this wound was in perfect agreement with the averments of the information.

The theory of the defense—self-defense—was not in any way based upon the number of the wounds, or upon the place or path thereof. The expert testimony as to the wounds was presented without any objection, without the defendant alleging any surprise and without his counsel making any effort whatever to object to the admission of the evidence with

respect to the wounds not described in the information. Furthermore, in the entire transcript of the evidence it appears that at no time during the trial was any question whatever raised with respect to the number or nature of the wounds.

A careful examination of all the facts and circumstances of the case leads us to the conclusion that the lower court did not err in any sense, or abuse its discretion, in refusing the bill of particulars prayed for.

█ Counsel for the defendant complained that the trial court decided the motion without hearing the defendant. It does not appear from the record what reason the court might have had for deciding the question without hearing the petitioner. It might have been that the court refused to consider the petition for the reason that it was not verified in accordance with the practice followed for such motions, or for the reason that it considered the motion frivolous or presented for the purpose of delay. In any event, although this court is not desirous of encouraging or sanctioning the practice of deciding motions without hearing both of the interested parties, we believe that in the instant case the essential rights of the defendant have not been affected by the decision of the court below.

The first and second errors are without foundation and must be dismissed.

█ 3rd.—That the trial court erred in overruling the motion of the defendant in which it was asked that the court empanel the jurors who were to hear the case.

The appellant maintains that the motion was presented on July 31, 1934; that on August 7, 1934, the day set for the trial of the case, the court empanelled the jury and postponed the trial until the 8th of August, the day following. He argues that the court erred in not empanelling the jury as soon as the order of July 22, 1934, was entered, the date upon which the trial of the case was set for August 7, as provided by Rule 6, above.

Neither in the record nor in the transcript of the evidence, which are all of the documents constituting the judgment roll on this appeal, do the dates appear upon which the panel for the selection of the jury to hear this case was empanelled drawn and summoned. In the record of the trial it is stated:

"Be it remembered that on the 8th, 9th and 10th days of August, 1934, upon setting in the calendar of criminal matters of this court, before the judge thereof, the Hon. Charles E. Foote, a trial of this case was had *before a jury duly empanelled and sworn in accordance with law,* which was comprised of the following members:"

We have made a careful examination of the record in this case, and we have not found any statement whatever that the defendant challenged the panel as not having been empanelled, drawn and summoned in accordance with the provisions of the above cited Rule 6 of the court. In the record of the trial it appears that after the information had been read to the defendant, after he had reaffirmed his plea of not guilty and after the witnesses for both sides had been sworn, the jury was empanelled, both sides agreeing that the stenographer would not take notes of the examination of the jury unless some incident should arise during the course of the examination. Among the incidents which appear set forth in the transcript of the evidence, there is not a single one which refers to or has any relation to the date on which, or the manner in which, the selection and return of the jury panel was made.

Our Code of Criminal Procedure (ed. 1935) provides:

"Section 211.—A challenge to the panel is an objection made to all the jurors returned, and may be taken by either party.

"Section 212.—A challenge to the panel can be founded only on a material departure from the forms prescribed in respect to the drawing and return of the jury or on the intentional omission to summon one or more of the jurors drawn.

"Secton 213.—A challenge to the panel must be taken before a juror is sworn and may be in writing or be noted by the clerk, and

must plainly and distinctly state the facts constituting the ground of challenge.''

There is no showing whatever in the record that the defendant made use of the right granted to him by Section 211 above, to challenge the panel on account of a departure by the court from the practice prescribed for the drawing and return. Since the defendant was represented by able counsel, familiar with the provisions of law above set forth, we must reach the conclusion that the defendant waived his right to challenge and accepted the panel as legally constituted. See *People* v. *Vázquez*, 20 P.R.R. 338; 35 C. J. 279, Section 245.

As a result, the error assigned to the lower court does not exist.

■ 4th.—That the court below erred in not permitting counsel for the defendant to cross-examine Gustavo Ramírez de Arellano, a witness for the prosecution.

From the transcript of the evidence it appears that Mr. Gustavo Ramírez de Arellano appeared at the trial of the case as a witness for the prosecution, and that upon direct examination by the prosecuting attorney, he testified solely that he live in San Germán; that he knew the defendant; that he knew *doña* Camila Ramírez de Arellano, a first cousin of his; that he knew Rafael Vives Nazario; that about May 19, 1934, he was in *doña* Camila Ramírez' house because she had sent for him to see if he could stop the marriage of her daughter to Rafael Vives Nazario.

At the conclusion of the direct examination of this witness he, upon cross-examination by the defense, testified that he did not know whether any person other than himself had been requested to come and discuss the marriage of *doña* Camila's daughter to Vives; that he was upon that day in Camila's house. The following then ensued:

''Counsel for Defendant: Did you there discuss the matter, what reasons . . .

"Prosecuting Attorney: We object. The prosecuting attorney has not asked him whether it was discussed or not.

"Counsel: But we can discuss the question. Not in whole, but with respect to what the witness did there.

"Prosecuting Attorney: The prosecuting attorney did not ask him anything except why he was called there."

The court sustained the objection of the prosecuting attorney, and the defense took an exception. The defense contends that the decision of the court is erroneous "because it favors the prosecuting attorney's effort to prevent an eyewitness of the facts from being examined by the defense."

We are of the opinion that the lower court committed no error whatever when it sustained the objection made by the prosecuting attorney to the questions of the defense, as to matters which had not been covered by the direct examination of the witness.

Our Code of Civil Procedure (ed. 1933) (Law of Evidence, Section 155) provides:

"Sec. 517.—The opposite party may cross-examine the witness as to any fact stated in his direct examination or connected therewith."

The decision of this Supreme Court, in the case of *People* v. *Fernández,* 14 P.R.R. 611, is to the effect that:

"Applying the familiar maxim of construction *expressio unius est exclusio alterius,* it is plain that the cross-examination must be confined to the facts brought out on the direct examination. This precludes the extension of the cross-examination to facts lying beyond these limits."

The question on cross-examination to which the prosecuting attorney objected, and which was not allowed by the court, clearly exceeds the limits of the direct examination. On direct examination absolutely nothing was said as to what was discussed at the house of Camila Ramírez de Arellano. The very words of counsel for the defendant, in saying that the court in sustaining the objection "favors the prosecuting attorney's effort to prevent an eye-witness of the facts from

being examined by the defense,'' shows that his intention was to take advantage of the cross-examination of a witness, who had said nothing on direct examination as to the facts which he saw, to make him testify about new matter which had not been raised on direct examination. This is not the function of cross-examination, and we believe that the court complied with its duty in not permitting the question in this case.

If the defendant had any interest in having the witness testify as to matters which might have been pertinent to his defense, he could have called him to testify as a witness for the defense. It seems that counsel for the defendant had that intention, since at the conclusion of the colloquy above-quoted, counsel for the defense asked the court to order the witness to remain under the rules of court, and it was so ordered. The defense deemed it prudent not to call him.

The alleged error is dismissed as lacking in merit.

■■ 5th, 7th, 10th and 11th.—That the trial court erred in refusing to give the following instructions to the jury requested by the defendant:

"5th..—The court instructs you that a person is justified in taking life in defense of his habitation where it is actually or apparently necessary to do so in order to repel another person who attempts to assault a persond dwelling or being in the house. *People* v. *Méndez*, 40 P.R.R. 727. In the case now before you the court wishes to instruct you that if the gentlemen of the jury come to the conclusion that the wife of the defendant was insulted and that it was really or apparently necessary for the defendant to attack the deceased to repel or to avoid an assault by Rafael Vives, known as Gallego, then the defendant acted in the exercise of his legitimate right of self-defense and you are bound to find him not guilty.

"7th.—The defendant has set up the theory of self-defense as relieving him of responsibility and it is for the gentlemen of the jury to determine whether or not such self-defense exists in this case. If from an analysis of the evidence the jury has reached a conclusion that there was self-defense, or if it entertains a reasonable doubt as to whether the defendant did or did not act in self-defense, in either case the jury must bring in a verdict of not guilty, because even the benefit of a doubt in the exercise of self-defense must be

given to the defendant. 13 California Jurisprudence, page 737, paragraph 104; *People* v. *Pacheco,* 40 P.R.R. 377.

"10th.—A person may meet force with force in the defense of his person, property or life, against one who openly intends or seeks though violence or through surprize to commit any misdemeanor or felony, or either, or to cause grave bodily injury to his person, and the danger which would warrant the defendant to commit the act with which he is charged, may be real or apparent, and the jury is not bound to determine whether the defendant was in actual danger of his life or property but only whether the circumstances were such as to induce a person of sound mind to believe that his person or his property was exposed to such danger, and if he reasonably so believes and if he had sufficient cause so to believe and committed the act with which he is charged under such belief, although it might appear that the deceased was not armed, you must find him not guilty. *People* v. *Chico,* decided by the Supreme Court of Puerto Rico on July 19, 1933. *People* v. *Sutton,* 17 P.R.R. 327.

"11th.—The court instructs you that the law requires only that the danger in which the defendant found himself was real to such defendant in order that such defendant be justified in killing in self-defense. (*Francis* v. *State,* L.R.S. (N.S.) Vol. 3, Page 541.)"

We have read with care the instructions given by the court to the jury with respect to self-defense. From them we copy the following:

"A death caused in self-defense is justified, is excused by the law, and it not an unlawful death.

"* * * * * * *

"The defense set up by the accused is self-defense. A person against whom any harm is intended may offer the resistance necessary to prevent an offense against his person. The right of self-defense in no case extends to the infliction of more harm than is necessary for the purpose.

"To justify a death in which self-defense is alleged, it is necessary not only to believe, but to have well-founded reasons to belive that when killing the aggresor, the person attacked found himself in immediate and imminent danger of death or of suffering serious personal injury. The circumstances must be of such nature as to convey to the mind of a person of moderate prudence the conviction that the defendant found himself in danger of losing his life or of suffering grave personal injury. Well-founded fear does not mean the fear of a coward, but the fear of a person of moderate courage.

"To justify a death in which self-defense is set up, it must appear that the person causing death was reasonably blameless and without fault. He must have believed at the time at which he did the act that he was in such immediate and imminent danger of losing his own life or of receiving such serious bodily injury that he had necessarily to take the life of his assailant in order to save himself. The circumstances must have been such as to convey to the mind of a person of moderate prudence the conviction that the defendant found himself in danger of death or receiving serious bodily injury.

"The defendant sets up self-defense and upon him is the duty of bringing evidence in support of his plea, but he is under no obligation to bring, to introduce evidence sufficient to convince the jury that he was acting in self-defense beyond a reasonable doubt. It is sufficient if he introduces evidence of self-defense which considered by the gentlemen of the jury together with all the evidence in the case, raises in the mind of the gentlemen of the jury a reasonable doubt as to the guilt of the defendant.

"Gentlement of the jury, it is highly important that you turn your attention upon the situation as it existed when the defendant fired the shot which wounded the deceased and caused his death; the place where the defendant was, the place where the deceased was. All the circumstances, everything that existed in those moments must be taken into consideration in deciding the question of self-defense, but particularly in deciding the question as to whether the defendant had well-founded reasons to believe in those moments that he was in immediate and imminent danger of death or of suffering serious bodily injury.

"* * * * * * *

"If you believe, gentlement of the jury, that the defendant acted in self-defense, you must find him not guilty."

The appellant does not complain in the errors which we are discussing, of the instructions given by the court, but of the refusal of the court to give instructions in the form requested by counsel for the defendant.

We are of the opinion that the instructions given by the court covered amply and justly and impartially the legal rule as to the right of self-defense, perfectly adapted to the facts established by the testimony of the eye-witnesses, which we

shall examine further on in this opinion. The instructions given covered practically all the points suggested by the defense in the instructions requested by them, and denied by the court. Certainly the court refused to give them for fear of confusing and unduly impressing the jury.

In Ruling Case Law we find the following:

"22.—*Charging on Points Already Covered.*—The court should instruct the jury fully and fairly on the law applicable to the case, and it is the right of the parties as well as the jury to insist that the court perform that duty. But where the jury has been fully and accurately instructed on the points in issue it is improper to reiterate or repeat the instructions in words or in substance, as to do so tends to mislead and confuse the jury by placing undue emphasis on the particular points in reference to which the instructions are repeated. Hence a court is not bound to give the same instruction as often as it may be asked, but has a discretion to refuse it, after it has once been clearly given. And the rule has long been established, by an unbroken line of judicial authority, that the refusal to give a requested instruction, even though it states the law correctly, does not constitute reversible error if it is substantially covered by the instructions given . . ." 14 R.C.L. p. 75L.

See the *People* v. *Español,* 16 P.R.R. 203; *People* v. *Lladó,* 33 P.R.R. 825; *People* v. *Rodríguez,* 41 P.R.R. 391; *People* v. *González,* 42 P.R.R. 215; *People* v. *Quirós,* 48 P.R.R. 20 . . .

This Supreme Court in the case of *People* v. *Martí,* 43 P.R.R. 421, said:

"In our judgment the refusal of the court was justified. In the first place, we find from a reading of the general charge which had already been given to the jury, that the same is in itself sufficient, and hence the requested instruction was unnecessary. In the second place, the wording of the instruction seems expressly intended to favor the defendant. And in the third place, the *Casanovas* case, from which the doctrine relied on for the instruction seems to have been taken, is different."

The same doctrine has been firmly established by the courts of California in numerous decisions and appears to have been summarized as follows:

"Sec. 366.—*Refusal of Requests Covered by Other Instructions.*—
The court is not required to state the law to the jury more than once,
but may, as a general rule, refuse requested instructions which are
fully covered by other instructions. A defendant in any given case
is not entitled to have his own particular phasing of the law adopted
by the court and given to the jury. It is sufficient if the substance of
the law applicable to his case is set forth by the court correctly in its
instructions." 8 Cal. Jur. 314.

The court acted correctly in refusing to give the instruc-
tions to which the 5th of the alleged errors refers. The facts
in the case of *People* v. *Méndez,* 40 P.R.R. 727, were entirely
different from those in the instant case. In that case, this
Court, after making a resumé of the proof, said:

"Although the jury may not have believed the witnesses for the
defense as to the manner in which the death was caused—which tes-
timony presents a clear case of exemption from responsibility for the
killing by the appellant in defense of his home—we think that, in-
dependently of such testimony, the evidence for the prosecution is of
such a character that it leads to the same conclusion."

The charge requested by the defense has been copied liter-
ally from the syllabus of *People* v. *Méndez, supra,* and the
form in which it is drafted shows clearly that the intention
of the defense was to favor the defendant by inducing the
jury to accept as a proved fact that the defendant had killed
in defense of his home and to avoid an attack upon the part
of the deceased against the defendant's wife. In the instant
case, if one puts aside the evidence for the defendant, the
evidence presented by the prosecuting attorney is without
any doubt sufficient to justify the verdict of the jury. And
even when we give credit to the entire evidence for the
defense, we find no basis for holding that the wife of the
defendant had been in any danger of being attacked by the
deceased.

The instruction requested by the defense, comprised
within the alleged 7th error, is based upon the doctrine set

forth by this Court in the case of *People* v. *Pacheco,* 40 P.R.R. 377, as follows:

"In a criminal case when an homicide is clearly shown, the burden is thrown upon the defendant to show at least a prima facie case of self-defense. Once a prima facie case is established, if there is a reasonable doubt whether or not defendant acted in self-defense, he should be acquitted. 13 Cal. Jurisprudence, 737, sec. 104."

The instructions given by the court in the instant case cover perfectly the legal point proposed by the defense and are not in conflict with the doctrine of *People* v. *Pacheco, supra.* The court said:

"The defendant has made a plea of self-defense and it is his duty to bring evidence in support of his plea, but he is not obliged to bring, to introduce evidence sufficient to convince the jury that he was acting in self-defense beyond a reasonable doubt. That it is to say, that he is obliged to bring evidence, beyond a reasonable doubt, that he was acting in self-defense. It is sufficient if he introduces evidence of self-defense which, taken together by the gentlemen of the jury, with all the evidence in the case, raises in the mind of the gentlemen of the jury a reasonable doubt as to the guilt of the defendant."

The lower court did not err in refusing to give the instruction which we have been discussing, since its transmission to the jury would have been an unnecessary repetition of what had already been said by the court and would certainly have confused the jury. The charge made by the court was ample and sufficient and was accepted as such by the defense when they failed to take exception.

The instructions refused, and which appeared in the 10th and 11th assignments, were amply covered by the instructions given by the court. It is not necessary to repeat them. The court did not err in refusing to give that part of such instructions which was not warranted by the evidence introduced during the trial and which would have confused the jury or lead it into error. The alleged errors Nos. 5, 7, 10 and 11 are dismissed as lacking in sufficient merit to warrant the reversal asked for.

 6th.—That the trial court erred in refusing to charge the jury as follows:

"The court instructs you that a party who voluntarily suppresses evidence available to him does so for the reason that if offered if would be adverse to him. In this case the prosecuting attorney suppressed the testimony of the witness Gustavo Adolfo Ramírez. Section 102, sub-section 5, Law of Evidence; *Méndez* v. *González et al.*, decided by the Supreme Court in June, 1934."

In its. instructions to the jury, the court had already said:

"The law of evidence provides that all 'evidence willfully suppressed would be adverse if produced'. I have referred to the testimony of the witness Gustavo Adolfo Ramírez de Arellano. The witness Gustavo Adolfo Ramírez de Arellano testified· briefly before this court; he was available to be called by either of the parties. You hay consider that there has been evidence suppressed by both parties. Either of the parties could have used his testimony; he was in the court, under the orders of the court during the trial. The court. instructs the jury that the word 'suppress' in accordance with· the Spanish dictionary, means 'omit'."

The defense took an exception to the instruction which we have just quoted.

A simple reading· of the instruction given and that denied is sufficient to show that they are practically the same, with the sole difference that the court applied to both parties the presumption arising from the fact that evidence which could have been presented was not presented. The appellant cannot complain of instruction given by the court so far as the prosecuting attorney is concerned, because that instruction coversthe legal point contained in the instruction which was denied.

Is the appellant right in saying that the lower court erred in instructing the jury that evidence had been suppressed by both parties? We believe not. We must remember that when theexamination of Gustavo Adolfo Ramírez de Arellano as witness for the prosecution was concluded, the attorney for the defendant asked the court to order the witness to retain under the rules of the court; and it was so

ordered, the witness being thereby at the disposal of both parties until the conclusion of the trial. Nothing appears from the record which shows that the defense would have been prevented in any way from using this witness as its own after having asked that he remain under the rules of the court. It is for this reason that we believe that the court did not err in holding that the suppression of this evidence or the failure to use this witness, who was at the disposal of the defense during the entire trial, raised a presumption that his testimony would have been adverse to the defendant.

The presumption which arises from the voluntary suppression of evidence may be rebutted by other evidence; and it may be made conclusive by showing that the evidence to suppressed was in reality adverse to the party who could have used it but suppressed it.

The record contains no showing as to what the witness would in fact have testified if he had been called. It appears only that the witness was present at the place in which the events occurred. In not using him as a witness for the principal facts of the case, the prosecuting attorney made it possible for a presumption to be raised against him that he was suppressing such evidence because he feared that it would be adverse. The court properly instructed the jury upon this point.

In his brief the appellant cites the case of *People* v. *Campán,* 34 P.R.R. 102, as being applicable to the instant case. We do not see the analogy betwen the two cases. In *People* v. *Campán, supra,* the prosecuting attorney cited fve witnesses, examined three, and waived the other two upon the ground that the evidence would be cumulative. The defendant thereupon used such two witnessed and showed by their testimony that their evidence was not cumulatvie, but evidence adverse to the prosecuting attorney. Of carse this court held that the presumption "was in fact confrmed."

The appellant in this case did not act as did the defendant Campán. He caused the witness so waived or suppressed by the prosecuting attorney to be placed under the rules of the courts, with the apparent intention of utilizing him as a witness for the defense, only to suppress him in turn, thus raising against him, as the prosecuting attorney had already done, the presumption which arises from the suppression of evidence which might have been used. The appellant had an opportunity of confirming the presumption of law against the prosecuting attorney, and did not take advantage of that opportunity for fear that the witness might be adverse to him and favorable to the prosecution. We are not convinced by the reasons set forth in appellant's brief to explain or excuse the failure to use the witness, Ramírez de Arellano, who was already presumed to be adverse to the prosecution, after he had been placed at the defendant's disposition and under the rules of the court during the three days of the trial.

It is true that a defendant is protected by a presumption of innocence which the law raises in his favor and that he is not bound to testify or to present any evidence whatever in his defense. But it is also true that once the fact of death at the hands of the defendant has been shown, if the defendant makes a plea of not guilty, then upon him falls the burden of proof to show at least a prima facie case of self-defense. Consequently we must reach the conclusion that if a defendant, during the course of presentation of his alleged self-defense voluntarily suppresses the testimony of a witness whom he has at his disposal, such suppression gives rise to a presumption that the evidence was suppressed for fear that it would be adverse.

We hold, therefore, that the court did not commit error prejudicial to the defendant either in giving the instruction in the form in which it did, or in refusing to give the instruction requested by the defendant, and that the alleged error number six must be dismissed.

■ 8th.—That the lower erred in refusing the following instruction requested by the defendant:

"The court instructs you that the burden of proof to show that the defendant killed the deceased deliberately and with malice aforethough rests upon the People in a murder case. The result is that the defendant is not required to show anything until it is shown that he deliberately and with premeditation killed, with malice aforethought, the deceased Rafael Vives Nazario."

Able counsel for the appellant states in his brief:

"The instruction, the denial of which gives rise to this assignment, is based upon the presumption of innocence which every defendant enjoys, and' upon the fact that the evidence necessary to find the defendant guilty must be convincing beyond a reasonable doubt."

Let us see what the lower court said with respect to the legal point covered by the instruction so refused:

"The defendant is deemed innocent until his guilt has been prove beyond a reasonable doubt, and in case there is a reasonable doubt, a well-founded doubt as to the guilt of the defendant, it is the duty of the jury to find him not guilty . . .

"The reasonable doubt, gentlemen of the jury, is a well-founded doubt, a doubt which arises from the evidence. It is not a whimsical doubt without reason and without basis . . .

"There is a reasonable doubt when, after consideration and deliberation upon all the evidence in the case, the minds of the jurors are in such a state as to prevent them from being morally certain of the truth of the accusation, of the guilt of the defendant . . .

"Now then, if you believe, gentlemen of the jury, upon a consideration of all the evidence in the case, both the evidence introduced by the prosecuting attorney, as well as evidence of the defendant, that there is a reasonable doubt, a well-founded doubt as to the guilt of the defendant, then you must find him not guilty."

That part of the proposed instruction as to which the defendant was entitled that the jurors be instructed, was amply covered by the instruction given by the court. The jury was duly instructed as to the presumption of innocence in favor of the defendant, as to the obligation of the government to prove guilt beyond a reasonable doubt, and as

to the obligation of the jury to give the defendant the benefit of the doubt. To this, and to nothing more, the appellant was entitled.

The appellant had no right to require the court to give the instruction in the form requested, for the reason that such instruction is clearly erroneous and contrary to the decision in the case of *People* v. *Cohn,* 76 Cal. 386, cited by the appelland as authority to sustain his contention. The opinion of the court in that case is so short that we are going to quote it in full:

"The defendant asked the court to instruct the jury: 'The burden is upon the prosecution of establishing *every element of the crime of which the defendant may be convicted, beyond a reasonable doubt.'* Through inadvertence, or for some reason which does not appear in the record, the court refused to give the instruction requested, *and omitted to give any other instruction of a like character, or stating or bearing upon the rule as to reasonable doubt in criminal cases.* Defendant took proper exception to the refusal of the court to give the instruction requested. Judgment and order reversed, and cause remanded for a new trial." (Italics ours.)

The instruction refused by the court in the instant case does not fall within the rule of *People* v. *Cohn, supra.* Under the information in this case, the defendant might have been convicted of murder in the first degree or of murder in the second degree or of voluntary manslaughter. The instruction requested by the defendant tended to exclude from the mind of the jury the idea that the defendant might have been convicted of voluntary manslaughter, that is, of having slain his victim without deliberation and without premeditation. To give the instruction requested would have been equivalent to saying to the jury: "If the prosecuting attorney does not show that the defendant slew deliberately and with premeditation, with malice aforethought, you must find him not guilty."

The judgment in *People* v. *Cohn, supra,* was reversed, not only because the court refused to give the instruction

requested, but particularly because it failed completely to give instructions with respect to a reasonable doubt. In the instant case, the court, in addition to the instructions which we have quoted and which we consider sufficient with respect to the obligation to give to the defendant the benefit of a reasonable doubt, gave specific instructions as to each one of the offenses of which the defendant might have been convicted, reiterating in each case that if the jury had a reasonable doubt, it must give the defendant the benefit of such doubt.

The lower court acted correctly in refusing to give the instruction requested. Assignment number eight is dismissed.

9th.—That the lower court erred in refusing to give the following instruction:

"The court instructs you that in order for you, gentlemen of the jury, to bring a verdict of guilty against the defendant, it is necessary that you be convinced that there is no other reasonable hypothesis as to how the events occurred, incompatible with the fact of guilt. In other words, if there is a reasonable hypothesis that the facts occurred in a manner different from that set forth in the information, such hypothesis excludes the absolute certainty of the defendant's guilt and you then, gentlemen of the jury, must render a verdict of not guilty."

The issue raised by the theory of the prosecution and of the defense is single, clear and specific. The prosecuting attorney maintained that the defendant unlawfully, with malice aforethought, killed the deceased Rafael Vives. The defense admitted that Vives' death had been caused by the defendant, but contended in justification of the homicide, that the defendant had killed Vives in the exercise of his right of self-defense, to repel Vives' aggression and to prevent the latter from killing him. One of the two theories found support in the evidence, and neither was based on hypothetical questions or on circumstantial evidence from which it might have been deduced that the homicide had been done under some other theory different from those set up by the parties.

The instruction requested by the defense, although correctly drafted, was not applicable to the facts of the case shown by all of the evidence introduced by both parties. The court did not err in refusing to give it. To have given such an instruction to the jury would have caused confusion in the minds of the jurors, prejudicial perhaps to the defendant himself, since the jurors might have interpreted the request of the defendant for that instruction as lack of confidence upon the part of the defendant in his theory of self-defense.

■ 12th.—That the lower court erred in giving the following instruction to the jury:

"The court instructs the jury that under our laws there is no defense of honor and dignity. That does not exist. Here the question is self-defense. It is admitted that the defendant caused the wound which produced the death of the deceased Vives Nazario, and he has made a plea of self-defense. That is the question which you must decide; that is the issue. Naturally if he acted in self-defense, accepting the instructions which the court has given upon that question, there in no other circumstance outside of the evidence."

We believe that the instruction is correct. The law recognizes the right of every person to defend his own life against unlawful attack, permitting him to go to the extent of depriving his aggressor of life, if it should be necessary to do so to save his own. But there is no law whatever which recognizes the right to repeal offenses to personal honor or dignity or to the honor or dignity of a member of his family, up to the point of depriving the offender of life.

The testimony of the defendant tended in part to justify the death of the deceased to the extent that the deceased had used offensive words, insulting to the dignity of defendant's wife. Having this in mind, the court acted properly in instructing the jury that even admitting that such offensive words were uttered, they would not be sufficient to justify a homicide.

■ 13th.—That the District Court erred in refusing to grant a new trial.

The motion for a new trial was based on the twelve alleged errors which we have already discussed and decided, and upon the following additional points:

A.—That the lower court erred in setting the case for trial, without following the order of cases in the calendar, in violation of Rule 5 for district courts.

B.—That the court erred in holding that the jurors, Luis Bolta and Constantino Santos, for the reason that the former is Assistant Treasurer of Mayagüez and the latter Treasurer of Añasco, could not act as jurors and could therefore be challenged for cause.

C.—That the court erred in providing that the foreman of the jury, Mr. Lespier, should write the verdict in open court.

D.—That the verdict was obtained by methods which were not a true expression of the op'nion of all the members of the jury.

E.—That the jury which heard the case was composed of twelve members, among whom there was one, José Ayala, who had been convicted of a felony; and that this fact was not known to the defendant until after the verd'ct had been rendered.

F.—That the defendant had discovered new evidence in his favor, which it was impossible to discover and produce at the trial.

G.—That the verdict is contrary to the evidence and to the law.

We shall now consider each of these points in the same order in which they have been set forth.

A—The appellant maintains that upon the date upon which this case was set for trial, there were thirty-three cases pending which had been filed prior to the instant case; that notwithstanding this, the court set this case as the only case to be heard at a special term, without setting forth any reasons or basis for such order; and that the failure to follow Rule 5 of the court is ground for a new trial.

The appellant does not contend, nor does it appear in the record, that the thirty-three cases which he says were filed prior to this case were ready for trial; similarly he does not contend that the setting made by the court caused any prejudice whatever to the defendant in the preparation of his defense. Moreover, the list of prior pending cases which is set forth in the motion for new trial lacks the necessary

requisites to give it proper authenticity, and cannot be con-sidered as a basis for a discussion and decision of the assignment. See *People* v. *Crespo,* 40 P.R.R. 363.

██ ██ ██ ██ The rule which it is contended has been violated provides:

"RULE 5.—At the time of making the first call of the general calendar of cases, the court shall enter an order fixing the earliest possible day within the term for the trial of causes on the calendar of causes to be tried by jury, upon which date the jury cases shall be called and disposed of in their order on the calendar."

From the record it appears that the defendant made a motion that the trial be continued for the reason, among others, that there were other prior cases; and that the court granted such motion, ordering that the trial of the case, which had been set for July 23, 1934, be continued until August 7, 1934. It does not appear from the record that the defendant took an exception to the order of the court; and on the contrary it appears that the defendant appeared at the trial and entered a plea of not guilty, without making any objection whatever to the holding of the trial on the date fixed by the court in its decision upon the motion for continuance. This would be sufficient to dismiss the alleged error without further consideration. See *People* v. *Winthrop,* 118 Cal. 85; 8 R.C.L. 68.

Courts have ample discretion to fix the dates for trials of cases pending before them and appellate courts ought not to intervene to control the exercise of that discretion unless it has been abused. See 21 Enc. Pl. & Pr., p. 975; *State* v. *Kelly,* 21 A.L.R. 156; *State* v. *Silvius,* 22 R.I. 322; *State* v. *Parry,* 26 N.M. 469.

In the case of *State* v. *Kelly, supra,* the defendant had been tried and there were several cases pending for similar offenses. To avoid technical defects in the earlier informations, the prosecuting attorney filed a new information on March 31, 1919. The court set the trial for the day following, April 1. When the case was called, the defendant made

objection and protested at being obliged to go on with the trial, contending that he was being deprived of his constitutional right to be represented by counsel and to present witnesses in his defense. The Court of Appeals affirmed the lower court, stating:

"The fixing of a time for trial in a case rests in the discretion of the trial court, and, in the absence of a showing of prejudice, the action of the court in the matter will not be interfered with on appeal. There was no showing of prejudice in the instant case."

In interpreting the New Mexico statute which provides that it shall be the duty of the district judge to set a day for the trial of every criminal case, which day shall not be prior to the third day of the term, and shall be fixed by the judge not less than twenty days prior to the first day of the term in which the case is to be held, the same court said:

"The statute is only directory. If it were held to be mandatory, then no case could be tried during the term at which an indictment was returned; and it has always been the practice in all the district courts of the state to set cases for trial during the term at which the indictment was returned."

The provisions of Rule 5 above and those of Section 181 of the Code of Criminal Procedure (ed. 1935) are directory and not mandatory in character and the court has ample discretion to fix the dates for the trial of cases pending before it. The apparent purpose and the fundamental reason for such provisions of law is to protect the right which every defendant has to a speedy trial, and to avoid the giving of preference to recent cases over those theretofore presented. In the instant case, the appellant complains that he has been given a more rapid trial than he expected.

No objection whatever was made to holding the trial on the date fixed by the court, nor is it contended that the court below abused its discretion or was prejudiced; and since it does not appear from the record that the defendant has been prejudiced as to any of his fundamental rights, we must

and do hold, that the court below acted correctly and that the error so assigned must be dismissed.

■■■■ B—Among the members of the jury panel there was a Mr. Luis Bolta. When he was examined by the prosecuting attorney he said that he was acquainted with the facts of the case from the newspapers and that he had formed a firm opinion but that he would change that opinion in accordance with the evidence; that he is a municipal employee discharging the office of Assistant Treasurer of the municipality of Mayagüez, and that for this reason he found himself in a situation which was inconvenient, embarrassing and disturbing, because of the fact that he did not know how long the trial would last. Upon being asked by the prosecuting attorney: "In spite of your employment by the municipality, do you wish to continue acting upon the jury?", he answered: "If you will excuse me I will appreciate it." The prosecuting attorney challenged him for cause, upon the ground that the juror would be disturbed and that this disturbance would affect the decision of the case. The defense objected that that would be ground for the juror to ask the court to excuse him but would not constitute ground for a challenge for cause. The court granted the challenge for cause and the defense took exception. The same happened when the juror Constantino Santos was called, who upon being informed by the prosecuting attorney that he was entitled to be excused from the jury by reason of his being Municipal Treasurer of Añasco, answered: "I don't care whether I am here or whether I am challenged."

We are not convinced that error was committed in permitting a challenge for cause of the two jurors in question. The court below, in the exercise of its discretion, could have interpreted the attitude and the words of each of the jurors as expressive of a desire to be excused upon the ground that both were municipal employees and could have excused them from serving in this case. The prosecuting attorney could have challenged them both peremptorily, since it does not

appear from the record that the prosecuting attorney had exhausted his peremptory challenges.

In Corpus Juris we find the following:

"It is well settled that the court may, for reasons which in the exercise of its discretion it deems sufficient, excuse jurors who have been summoned from serving . . . While the rights is in some cases recognized by statute, no express statutory authority for this purpose is necessary. The reasons are so numerous that they cannot be specified beforehand or reduced to any set rule but must be left to the court to dispose of as they arise, so that it is uniformly held that whether a juror shall be excused is a matter resting within the sound discretion of the court, the exercise of which will not be interfered with unless it is clearly shown to have been abused to the actual prejudice of the complaining party." 35 C. J. secs. 309, 310, p. 306–7.

"The court may properly excuse a person summoned as a juror where such service might conflict with the performance of other public duties, and may do so, although such office or duties do not constitute a ground of disqualification or entitle the juror to claim an exemption from jury duty." 35 C. J. sec. 311, p. 308.

The fact that the jurors were challenged for cause instead of being excused is not in our opinion of importance. The effect in so far as defendant is concerned, is the same as though the court, in the exercise of its discretion, had excused them.

It is not alleged in the motion for a new trial that the court abused its discretion or that it acted under any prejudice against the defendant; similarly it is not alleged that the defendant suffered any prejudice whatever on account of the fact that Messrs. Bolta and Santos were not on the jury.

In the case of *Hayes* v. *Missouri*, 120 U.S. 68, 71, the Supreme Court of the United States said:

"The right to challenge is the right to reject, not to select a juror. If from those who remain, an impartial jury is obained, the constitutional right of the accused is maintained."

It has not been contended in this case that the jury which sat at the trial was unjust or partial or incompetent. We

believe consequently that the fundamental rights of the defendant have not been prejudiced by the decision of the court with respect to the two above mentioned jurors, and that the alleged error must be dismissed.

██ C—It has been alleged that the lower court erred in providing that the foreman of the jury should write the verdict in open court.

Upon this point the motion for new trial says:

"According to the information and belief of the defendant, at the moment at which the verdict of the jury was rendered, the Honorable Judge of this court called the foreman Mr. Lespier and instructed him to write something with respect to the verdict, the defense not having been able to find out what the Honorable Judge said to the said foreman Mr. Lespier, the result being that the aforesaid Mr. Lespier wrote something on the Marshal's table which the defendant could not find out at that time. From what the defendant has been able to find out later, he alleges under information and belief, that when the verdict was delivered to be read by the clerk, it was not stated in such verdict whether the defendant had been found guilty or innocent of any crime whatever. At that moment the judge called the foreman of the jury and told him something unknown to the defendant, but it is true that the aforesaid Mr. Lespier then wrote in his own handwriting upon a piece of paper which he then delivered again to the court, an act which, as we have stated above, he did upon the Marshal's table in open court."

None of these allegations, all made upon the defendant's information and belief, are sustained either by the evidence presented in support of the motion for new trial or by any showing whatever in the record. On the contrary it appears from the record that the verdict found the defendant guilty of murder in the second degree and that at the foot of the verdict appears the signature of R. J. Lespier, foreman of the jury.

This court cannot consider questions which do not appear from the record or which have not been submitted with signs of authenticity necessary for them to be given credit.

In the facts so vaguely set forth in the motion for new trial happened as they have been set forth, the defendant, who was present and advised by competent counsel, ought to have found out better what happened, in order to formulate an objection and to take an exception as to any irregularity which might have been committed. The defendant could also have asked that the jury be polled to determine whether they were in agreement with the verdict read in open court, and not having done so, he thus renounced that right. The error assigned is dismissed as unfounded.

▪ D—We shall now consider appellant's contention that the verdict was obtained by methods which were not a true expression of the opinion of all the members of the jury.

In support of this contention and as a part of the motion for a new trial, the defendant presented affidavits of two of the members of the jury.

The juror Eladio Talavera states that when the jury retired to deliberate after having heard the instructions from the court, he was of the opinion that a verdict of guilty of voluntary manslaughter ought to have been entered, since he believed that the death had occurred during a quarrel, that other jurors were of the same opinion but that the majority was in favor of a verdict of murder in the second degree; that in view of this difference of opinion the foreman of the jury, Mr. Lespier, called the affiant aside and suggested to him that a verdict of murder in the second degree be given, recommending the accused to the court's mercy, which was the same as voluntary manslaughter; that believing this to be true, he accepted the verdict, and when he was asked by the clerk if that was his verdict, he answered yes. That later he found out that the two crimes are different and that the court may or may not make use of clemency; that he also found out that the maximum sentence which can be imposed in cases of manslaughter is ten years in the penitentiary, while in murder in the second degree the minimum is ten

years; and that if he had known all that before he would not have concurred in the verdict which the jury rendered.

The affidavit of the juror Manuel Fernández is substantially the same as that of the juror Talavera.

The question presented for our consideration has been decided against the defendant in many decisions, which we shall examine briefly:

"And even in those jurisdiction which still retain the earlier rule admitting the affidavits of jurors generally, the rule is not extended to include affidavits showing that the jurors misunderstood the court's instructions. If they differ about the instruction of the court, they should come into court and have them repeated; and if they fail to do this, they ought not to be permitted to show afterwards what their impressions or views of the instructions were. Were the practice to receive the affidavits of jurors, to explain the grounds of their finding, in disputed cases, but few verdicts would be retained, as jurors might be found who would allege as mistakes of law or fact, in making up their verdict, what were in reality afterthoughts, produce by conversations with the parties . . .

"For the same reason the affidavit of a juror cannot be received to impeach his verdict by showing that he misapprehended the evidence, or what were his impressions as to the effect of his finding, or that he intended something different from what he found by the verdict. Nor can affidavits of jurors stating the theory or ground on which they rendered their verdict be received for the purpose of impeaching it." 27 R.C.L. sects. 69, pp. 897, 898.

In the case of *Hughes* v. *State,* 148 S.W. 543, 556, in which the affidavits of the jurors were even stronger than in the instant case, the defendant was convicted of murder in the first degree and sentenced to life imprisonment, the court held that affidavits could not be admitted in which only the arguments used by the other jurors to convince the affiant were set up. A similar decision was rendered in the case of *Lee* v. *State,* 121 Tenn. 521, 116 S. W. 881, in which the defendant was sentenced to death. See *People* v. *Gray,* 61 Cal. 164; *People* v. *Holms,* 118 Cal. 448; *People* v. *Murphy,* 146 Cal. 502.

The decision in *People* v. *Soap,* 127 Cal. 408, is applicable to the instant case. The court there said:

"Appellant contends that the judgment should be reversed on account of the alleged misconduct of the jury by which they were prevented from giving the case a fair and due consideration. This misconduct is based upon the fact, which appellant sought to show by an affidavit of one of the jurors, that while the jury were in consultation over the case a statement was made by one of them that a verdict of manslaughter could only be followed by the punishment of imprisonment in the county jail for six months, and that such statement induced a large number of the jurors who had been voting for an acquittal to agree to a verdict of manslaughter. This contention cannot be maintained; for it has been definitely settled that the affidavit of a juror cannot be received to impeach the verdict except where it is the result of a resort to the determination of chance."

The same question here raised has already been considered by the Supreme Court in several cases, in which decisions adverse to appellant's contention were entered. See *People* v. *Lebrón,* 47 P.R.R. 408 and *People* v. *Cruz,* 49 P.R.R.

The error so assigned is dismissed as lacking in merit.

 E—That among the members of the jury there was a person named José Ayala, who had been convicted of a felony, and was therefore incompetent to serve as a juror; and that this fact was not known to the defendant until after the verdict had been rendered. In support of this contention appellant cites Section 187 of the Code of Criminal Procedure, which provides that one who has been convicted of a felony is incompetent to serve as a juror.

The appellant contends that when general questions were asked to all of the jurors as to whether any of them had been convicted of a felony, they all remained silent.

In his opposition to the motion for new trial, the prosecuting attorney in the case stated under oath that "the jury was not questioned, either by the defense or by the prosecuting attorney, as to whether they had been convicted of a felony and consequently the jurors could not have denied

it;" that the attorney Amador Ramírez Silva, who was in charge of the selection of the jury was acquainted with José Ayala and knew personally that he had been convicted of a felony; and that he also knew that his civil rights had been restored to Ayala by the Governor of Puerto Rico.

From the record there is no showing whatever to assist this appellate court in deciding the issue raised by the contradictory statements of the defendant and the prosecuting attorney. If it were true, as the appellant contends, that counsel for the defense asked all the jurors if any of them had been convicted of felony, and that the juror Ayala made no answer, we would in such case have to concede that there is some merit in the question which we are discussing. But the fact is that the appellant not only has presented no proof at all, or any showing whatever in the record, to sustain his contention, but the prosecuting attorney himself has attacked the truth of the contention under oath and maintains emphatically that no such questions were put to the jurors. The court below considered that question in passing on the motion for new trial and decided it adversely to the appellant. The trial judge was in a better position than we are to decide the conflict, for the reason that he had presided at the trial of the case and perhaps had some recollection of what actually happened during the examination and selection of the jury.

If we should admit, as the prosecuting attorney contends, that counsel for the defense did not question the jurors with respect to whether they had been convicted of a felony, in this case we would, in accordance with the authorities which we have examined, be compelled to dismiss the error assigned by the appellant, because a defendant, after he has had an opportunity to examine the jurors with respect to their competency to serve as such and has not made use of that opportunity through carelessness or lack of diligence, may not set up as ground for a new trial the incompetency of one of the jurors whom he has already accepted.

In the case of *People* v. *Chung Lit,* 17 Cal. 321, in which it was discovered after the verdict that one of the jurors was a foreigner, it was held:

"The objection that one of the jurors was an alien could not be taken for the first time upon the motion for a new trial. The defendants might have examined him upon the subject, and exercised their right of challenge before he was sworn, but having failed to do this, they must suffer the consequences of their own neglect."

In *Bristow's Case,* 15 Grattan, 648, cited in *People* v. *Mortier,* 58 Cal. 267, it was said:

"It is a principal cause to challenge to a juror that he was one of the Grand Jury which found the indictment, but unless he is challenged before he is sworn, the objection will be considered as waived, and his being on the jury will not vitiate the verdict . . . To permit prisoners to avail themselves, after verdict, of pre-existing objections to the competency of jurors, as a matter of right, would not only be unreasonable, but most mischievous in its consequences. The delays in the administration of criminal justice and the chances for the escape of the guilty ones would be greatly increased. Proper verdicts, especially in trials for grave offenses, would be continually set aside. A prisoner knowing or willfully remaining ignorant of the incompetency of a juror, would take the chances of a favorable verdict with him upon the jury; and if the verdict should be adverse, would readily enough make the affidavit necessary to avoid its effect."

See *George* v. *State,* 39 Miss. 570; *Kingen* v. *State,* 46 Ind. 132; *People* v. *Mortier,* 58 Cal. 267; *People* v. *Evans,* 124 Cal. 206; 16 C. J. pages 1152, 1153.

The prosecuting attorney has admitted that the juror Ayala had in fact been convicted of a felony, but maintains that counsel for the defense had personal knowledge of that fact at the time at which he examined the jurors. This court has no way of determining whether counsel for the defense did in fact have such knowledge, and consequently we do not decide that question. But the prosecuting attorney alleged moreover that Ayala was pardoned and restored to the enjoyment of his civil rights and that he was consequently competent to serve as a juror.

We have examined the authorities with respect to the effects of a pardon and the restoration of civil rights, and we find that in *Ex parte Garland,* 4 Wall, 333, 380, the Supreme Court of the United States said:

"A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity. . . .

"So far as that offense is concerned, he is thus placed beyond the reach of punishment of any kind. But to exclude him, by reason of that offense, from continuing in the enjoyment of a previously acquired right, is to enforce a punishment for that offence notwithstanding the pardon."

In *Knote* v. *United States,* 95 U. S. 149, the Supreme Court said:

"A pardon is an act of grace by which an offender is released from the consequences of his offence, so far as such release is practicable and within control of the pardoning power, or of officers under its direction. It releases the offender from all disabilities imposed by the offence and restores to him all his civil rights. In contemplation of law, it so far blots out the offence, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights. It gives to him a new credit and capacity, and rehabilitates him to that extent in his former position."

The same doctrine has been reaffirmed in the following cases: *U. S.* v. *Padelford,* 9 Wall 531; *U. S.* v. *Klein,* 13 Wall 128; *Armstrong* v. *U. S.,* 13 Wall 155; *Osborn* v. *U. S.* 91 U. S. 474.

In the case of *Easterwood* v. *State,* 31 S. W. 294, the defendant discovered after the verdict had been rendered that one of the jurors had been convicted and had served a prison term for an offense of larceny. He made a petition

for a new trial on this ground. The state answered, alleging that the juror had been pardoned by the governor of the State of Texas. The Code of Criminal Procedure of that state provides that a person who has been convicted of larceny is incompetent to serve as a juror, even with the consent of the parties. The Court held:

"When a full pardon takes effect, all disabilities disappear, and the grantee stands as if he had never been convicted. A removal of the conviction necessarily removes the disabilities, because they are but consequence of the conviction. This would, therefore, restore the party to his right of suffrage, and his competency as a juror. The authorities are clear upon these question, as we understand them."

See *Wickizer* v. *Williams*, 173 S. W. 288; *U. S.* v. *Bassett*, 13 Pac. 237; *Puryear* v. *Commonwealth*, 1 S. E. 512.

We have discussed this question more or less hypothetically for lack of an authenticated record to assist us in deciding it. If we accept the record presented by the appellant, we must overrule the objection as having been taken too late and for lack of due showing that the juror Ayala had been convicted of a felony. If we accept as proof of the conviction of Ayala the admission made by the prosecuting attorney under oath, we must also accept his sworn and uncontradicted statement that the juror was pardoned and restored to his civil rights by the Governor of the island, in which case under the authorities cited, Ayala was competent to serve as a juror, and appellant's objection is unfounded.

■■■ F—Appellant contends that after the trial new evidence was discovered consisting in the testimony of the defendant's wife which could not have been obtained theretofore on account of the nervous condition in which his wife was after the events.

From the record it does not appear that any motion whatever was made by the defendant for a continuance of the trial until it might be possible for his wife to testify or that any reference whatever was made to the need of such testimony by the defense. It is difficult to believe that the

defendant, from May 19, the date on which the deceased was killed, until August 8, 1934, the day of the trial, has not been able to talk to his wife nor able to find out that her testimony would be favorable to him.

Section 303 of the Code of Criminal Procedure, which governs the granting of new trials, provides in paragraph 7 that:

"7.—When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly, discovered evidence, the defendant must produce at the hearing in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable."

It does not appear from the record that the requirements of the subsection just quoted had been in any way fulfilled, with respect to the presentation at the hearing of the motion for new trial of an affidavit of the defendant's wife. Similarly such affidavit was not presented as a part of the motion. In the motion reference was made to the testimony of Camila Ramírez and to that of a medical expert, whose name was not mentioned; but the affidavits of the proposed witnesses were not attached.

The presentation of such affidavits is absolutely necessary in order that the court to whom the petition for new trial is presented may weigh them and decide whether they would be sufficient to alter the verdict rendered by the jury. This court has so held in numerous cases. See *People* v. *Milán,* 7 P.R.R. 442; *People* v. *Otero,* 11 P.R.R. 330; *People* v. *Viader,* 23 P.R.R. 672; *People* v. *Muñoz,* 25 P.R.R. 192, *People* v. *Quiles,* 41 P.R.R. 904.

The motion for new trial in so far as it was based on the discovery of new evidence, was properly overruled. The error assigned on this ground must be dismissed.

■ G—It is contended as a final ground for the petition for a new trial, that the verdict is contrary to the evidence and to the law. For this reason, although we are not bound to do so, we shall make a résumé of the evidence introduced at the trial.

The first witness for the prosecution was the medical expert, Dr. Edgardo Quiñones, who made an autopsy upon the body of Rafael Vives Nazario, and testified that the determining cause of death was heart failure produced by the bullet wound described in the information.

After that, Petra McDougal testified as a witness for the prosecution, stating that she was the daughter of Camila Ramírez de Arellano, step-daughter of the defendant, and fiancée of the deceased, who had been courting her during five years prior to his death; that she was going to marry the deceased on May 19, the same day on which he was killed; that on that day Vives was in her house about three o'clock in the afternoon, talking to her on the porch; that Vives had gone down to the street to start a car, when the defendant rode up in his car; that the defendant addressed himself to Vives and told him that he had to talk to him, at the same time inviting Vives to get into the defendant's car; that the witness told Vives: "Don't get into that car"; that then Vives told the defendant: "Just a minute," went up to where the witness was and she told him: "I don't want you to get into that car," and he answered: "If that's the way you feel, I won't do it"; that then the defendant came up to where the witness and Vives were on the house steps, took hold of Vives by the belt and said to him: "Come inside, we've got to talk"; that Vives did not want to go in and the defendant told him: "Come inside. I don't want to have a scene here outside. Come on in. I'm not going to do anything to you"; that they then went into the living room, and Vives sat down in a chair toward the left, the defendant toward the right, and the witness on a sofa and Gustavo A. Ramírez toward the left; that when they were

seated the defendant said to Vives: "Doña Camila came to the country and told me that you wanted to get married. What do you want to get married for?"; that Vives answered: "Why should we not get married? It does not seem possible that you and her mother think bad of her"; that Vives said not another word; that at that moment the defendant moved as if to draw a revolver; that Vives had a cap and he put it thus *(sic)*; that the defendant fired at Vives who raised his hand to his head and tried to walk, and that the defendant then fired a second time; that Vives kept on walking and the defendant turned and fired the third shot at his back; that Vives kept on walking and went into the dining room, falling at the door to the kitchen; that then the witness said to the defendant: "Coward, kill me too," and went to the door of the kitchen where Vives lay; that the cap was still smoking; that the only person armed was the defendant; that the defendant fired the three shots with his right hand.

Francisca Ruiz, a servant in the house, testified that from the door of the dining room she saw the defendant invite Vives to go into the living room, telling him: "Come on up. I'm not going to do anything to you. I just want to have a word with you;" that they sat down in the living room and then the witness closed the door at the moment in which the defendant said to Vives: "Sit down"; and that at that moment she heard three shots; that she did not see who fired the shots; that the three shots were one after the other; that at the last shot Vives came out running, collided with the partition and fell down face up when he came to the kitchen door; that she did not see anyone armed; that when the witness was in the kitchen she heard a voice say: "What are you going to do," and that that voice was the voice of Petra McDougal.

José Gabriel Dávila testified that he used to go to various houses in San Germán to get scraps to feed his animals; that on the day in question he saw Vives while he was passing

in front of Camila Ramírez' house; that he saw the defendant arrive; that Vives and the defendant went toward the defendant's automobile and that the defendant opened the door in order that Vives might get in, but that he did not get in, and that the two then went up onto the porch of the house; that Petra McDougal was at that time on the porch; that after he got on the porch the defendant said: "You can come in. I'm not going to do anything"; and that they then went into the living room; that the house has four doors on the front and that they were all shut.

José V. González, District Chief of the Insular Police, on duty in San Germán on the day in question, testified that he did not know the defendant until that day, when the defendant came alone to police headquarters, wrought up and nervous, took his hand out of his pocket and said to the witness: "Take this revolver, with which I have fired three shots in my house at Rafael Vives and I think I have wounded him"; that the revolver delivered to him by the defendant had three shells already fired and three not fired; that the defendant made these statements spontaneously without any threats or promises of immunity upon the part of the witness; that after making these statements the defendant said: "I reserve the absolute right to say everything that I have to"; that the defendant told him that "he had been compelled to do an act of honor and dignity."

In support of the plea of self-defense, the defendant presented the following evidence:

Pedro Luis Ronda testified that he was an artisan by occupation; that the day in question he left his shop to deliver an order and upon passing in front of the house of Mrs. Ramírez saw the car of the deceased Vives and that the witness saw Vives open the left door of the dashboard compartment and take out a revolver and put it under a cap; that the dashboard compartment to which he refers is a box alongside of the speedometer; that the revolver was of nickel with a black barrel; that the cap was white; that the wit-

ness was surprised and that at that moment his friend, Mario Gregory was going along there, uptown, and the witness called Gregory and said to him: "Come here. It looks like something's going to happen"; that both of them stopped there and in a few minutes heard three shots in the defendant's house; that the witness at that time did nothing, but later went into the house; that he is acquainted with Petra McDougal and that he saw her on the porch before and after the shots; that at the time of the shots he saw her on the porch and that after the shots the witness looked up and saw Miss Petra going inside; that the revolver shown to him by counsel for the defense looks like the one he saw in Vives' hands.

Upon cross-examination by the prosecuting attorney, the witness Ronda answered that he was acquainted with Juan Toro, the person pointed out to him, that he was employed as a cane loader; that he does not remember the dates on which he worked with Toro loading sugar cane on the farm "Filial Amor" of Ernesto Quiñones; that during the month of May, 1934, he was not working on that farm; that it is not true that on May 19, 1934, the witness was with Juan Toro about four o'clock in the afternoon collecting his wages from the paymaster on that farm; that on the 19th of May he was not on the farm "Filial Amor" and that he is sure of that because he was present in the affair of Rafael Vives Nazario.

The testimony of Mario Gregory was substantially the same as that of Pedro Luis Ronda and in addition he said that when he went up the steps he met a man running down and that he was not acquainted with that man. Upon cross-examination by the prosecuting attorney he admitted that he had testified in the investigation carried out by the prosecuting attorney but contended that he did not remember to have said: "What I saw, nothing. What I can tell you is that I passed by a little after three in the afternoon, I heard three shots, I stopped to see what was going on, and I saw Peru-

cho Ramírez come down from the house, get in his car and drive down-town.'' Upon re-direct examination by the defense he testified that he saw the defendant after the event but when the shots were fired he did not see him.

Enrique Fernández testified that he is a peddler of powder, pins and notions; that on the 19th of May he was going along the street in San Germán and he saw a young lady on the porch of a house to whom he offered his wares; that the young lady answered him with a gesture of impatience: ''Look and see if there is anybody inside that wants to buy anything''; that then he went up the five steps and stopped at the door and that he saw there five or six people, among them the defendant; that he does not know the other persons seated in the living room, but he recognizes Petra McDougal, Gustavo Adolfo Ramírez and the defendant as persons who were there that day; that the witness heard them talking about a wedding; that he offered his wares and nobody answered him; that then a man who was there in shirt sleeves got up and argued with the defendant; that he saw them arguing and heard a loud shot, but almost immediately he heard two more shots; that he saw a little short fat man kick something with his foot; that the witness looked down and saw that it was a revolver and he picked it up and being frightened went down the steps and there behind a fence he threw it and the revolver went flying across some plants and fell in the yard; that the man who kicked the revolver with his foot was the defendant; that the witness did not go into the living room but stayed at the door; that he could not tell who it was that was talking about a wedding; that he was there at the door for five or ten minutes; that the only thing that he heard was the word ''wedding''; that the revolver which he has been talking about was white with a black barrel, but he does not know whether it was loaded; that he did not tell anybody what he had done with the revolver, that he did not inform the police or say anything to anybody, because he was frightened and did not

want to get mixed up in the matter; that he came to testify at the trial because about fifteen or twenty days after the event, while he was in the market, a little short man came up to him and said: ''You are the same man that picked up a revolver and threw it in the yard of the house''; that the witness admitted that he was and upon being asked by the other if he would assist him if he needed it, the witness told him it would be all right; that they met by accident; that he saw the two men arguing and heard a shot, but he does not know who fired; that two consecutive shots were fired, but that he could not determine who fired them; that he was about seventeen feet away; that he could not determine which of the two men had the revolver; that he did not see the defendant leave the scene of events, and does not know whether the defendant stayed there; that the witness stayed there about two or three minutes after the shots, did not stop in the street and went away rapidly.

Alberto Nadal. He testified that he was an iceman in San Germán; that he does not know the names of the streets in the town, but that on May 19 he was in the front of the house belonging to Camila Ramírez, the defendant's wife; that he saw there Gustavo Adolfo Ramírez, *doña* Camila, the defendant, Petra, daughter of *doña* Camila, on the porch; that Gustavo, Camila and the defendant went inside and Miss Petra McDougal stayed on the porch; that he was acquainted with Vives and also saw him when he came in his automobile; that Vives got out of his car and was holding his hand over his stomach and a cap over his right hand; that Vives went into the house; that the witness was standing there because they said that that afternoon they were going to get married and he was surprised not to see any excitement; that he heard a murmur; that they were talking about a wedding, but he could not hear very well nor did he know about whom they were talking; that he heard a very loud shot and then in succession two weaker shots, but he does not know who fired them; that in addition to the persons he

mentioned, he also saw a man there carrying some boxes which seemed to have some things in them; that he recognizes Enrique Fernández as the man he mentioned; that he saw that man when he picked up the revolver, went to the steps and threw it in the garden, and that the revolver flew over some bushes and fell in the garden; that the witness went up the steps and picked up the revolver on the same day, carried it away and had it in his possession fifteen or twenty days; that the revolver to which he is referring is the same as that shown to him by the counsel for the defense, but that it is not loaded; that when he picked it up it had one shot fired and five unfired; that one afternoon, while he was delivering ice, he met the defendant and told him about finding the revolver and the defendant said: "Well, I need that revolver, because it is a big part of my defense"; that he then went to look for the revolver and delivered it to the defendant; that before the shots he saw the deceased enter the living room and that he saw him seated in the living room; that then Vives stopped and as he stopped, he struck at the defendant with his left hand and they tangled up, and as they tangled up he heard a loud shot and then two consecutive shots; that the last two shots were fired more rapidly; that he was in the street standing there listening, but that he had no particular interest in hearing; that he did not see what Vives was carrying under the cap; that he did not tell the authorities or anybody that he had seen a man pick up a revolver until he told the defendant fifteen or twenty days later; that he did not know that the crime was being investigated and that he did not give the matter any importance; that the door of the living room at the time of the events was half open, that is, it had one panel open.

Finally the defendant Pedro Ramírez testified in his own defense and said that on May 19, while he was in the country, his wife, Camila Ramírez came to invite him to go to a family reunion to discuss the wedding of his step-daughter, Petra McDougal with Rafael Vives Nazario; that he was of the

opinion that they ought to be allowed to get married and that his wife wanted to delay the wedding in order that she might make preparations; that he went home about 2:30 in the afternoon and that when he went up on the porch, he saw Petra there, his wife, Gustavo Ramírez and Rafael Vives; that when he went up onto the porch they began to talk about the matter and he suggested that they go inside in order that the passers-by might not overhear them; that then he and Gustavo Ramírez went into the living room and Petra stayed on one side of the steps, on the porch, and Vives stayed there with her; that a little while later Vives also came into the living room; that Camila, his wife, was standing in front of the witness; that then his wife spoke to Vives and told him that she would like to have the wedding a little later because she had to get Petra ready; that the witness told Vives that he ought to do what his wife said; that Camila asked Vives why he wanted the wedding so soon, to which Vives answered that he saw no reason why there should be any opposition to Petra's marrying him because he was from one of the best families in San Germán while she was the daughter of a negro cook; that upon hearing that, the witness told Vives that he couldn't permit that and to get outside; that Vives answered: "The ones that are going out are we two"; that he came and stood over him with the right hand held over his stomach, covered with a cap, and hit him in the face with his left hand; that then the witness seized his hand and he threw his arm across the witness' shoulder, pushing him; that the witness brought his right hand down to where Vives had the cap and found out that he had a revolver, and then he tore loose and Vives fired at him and he thought he was wounded; and that at the same time he found his revolver, and shot at Vives twice; that after he had fired the two shots he saw that Vives was weakened and had dropped the revolver and then he gave the revolver a kick, causing the weapon to fall through the porch door and there a man selling notions, of whom nobody

had taken notice, picked up the revolver and left; that at the moment of the fight, Petra was not in the living room; that after the two shots, he went down, got into the car, and went to the police headquarters to turn over his weapon; that the chief of police asked him how many shots he had fired and he told him two, and that the chief said: "No, but the revolver has three shots fired"; and that then he told the chief that he did not want to make any further statements; that upon turning over the weapon he told the chief that he had fired the shots in the defense of his home and of himself; that the revolver had three shots fired because the night before he heard some dogs barking, got up and fired a shot and that that was the reason for the other fired shell; that when he felt the first shot he thought that Vives had wounded him and that he was going to kill him; that he did not take out the shell after firing at the dogs because he was used to firing sometimes and to leaving the shell in the revolver for months; that he did not say anything to the chief of police about the shots which he fired at the dogs; that the only thing he told him was that he was not going to talk; that he did not see Vives when he got home; that he saw him on the porch and when he came into the living room; that he did not at any moment notice how Vives was carrying the cap until Vives threw himself upon him; that the argument in the living room between the witness and the deceased lasted about ten minutes and that he did not notice where Vives had his hands or the cap or the revolver; that he did not tell the chief of police that the deceased had fired a shot at him, because he had refused to make any statement, making use of the right granted to him by law; that he did not pick up Vives' revolver because another man picked it up, but on the day following he began to look for it; that the revolver was the same as that shown to him by his counsel; that he had that revolver in his possession until two days before the trial, when he delivered it.

to his attorney; that the revolver was turned over to him by Alberto Nadal and is the same as that which he kicked.

At the conclusion of the defendant's evidence the prosecuting attorney presented his evidence on rebuttal:

Juan Toro testified that Pedro Luis Ronda, the witness for the defendant was working with him, loading sugar cane, on the farm, "Filial Amor" during the whole month of May, and part of June, 1934; that the witness was the one who used to pay Ronda his wages; that on May 19, 1934, Ronda was working with the witness from six in the morning until three in the afternoon; that after they quit working they went to the place where they collected their pay, in the Ward Coto, and that there were four persons there who had been working together, among them Ronda; and that at that time, while they were collecting and while Ronda was there, they heard the news that Vives had been killed.

José V. González Bermúdez, District Chief of the Insular Police, testified that it was not true that he had asked the witness: "Why are there three shots fired?", and that the witness answered him: "Yes, but I did not fire more than two"; that it is true that when the defendant came to headquarters he took out his revolver and told him: "Here is this revolver from which I have fired three shots and I believe I have wounded Rafael Vives in my own house."

The divergences and contradictions between the testimony of the witnesses for the prosecution and those for the defendant revealed by an examination of the evidence, are explainable if consideration is given to the fact that the theory of the parties are also divergent and contradictory.

The jury has the right and the duty to determine whether the evidence is sufficient to sustain the charge against Pedro Ramírez of having killed Rafael Vives Nazario with malice aforethought and with the deliberate intention of killing him, or whether, on the contrary, the evidence for the defendant satisfactorily establishes self-defense. The law empowers the jury also to pass upon the credibility of the witnesses

278

and to resolve the conflicts or contradictions which may arise from the evidence adduced by both parties. It is the duty of the trial court and of the appellate courts to uphold its verdict, except in those cases in which the jury has committed a manifest abuse of its powers.

We are of the opinion that the evidence introduced by The People is sufficient to sustain the verdict rendered by the jury and that the jury in no way abused its powers in not believing the witnesses for the defendant.

The judgment appealed from must be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.