[No. 10,544.—In Bank.]

## PEOPLE *v.* HARVEY MORTIER.

IMMATERIAL ERROR—CRIMINAL LAW.—A judgment in a criminal case will not be reversed for the failure of the Court to inform the defendant that if he intended to challenge an individual juror he must do so before the juror is sworn, if it appears that the defendant was not prejudiced by the omission.

JUROR—CRIMINAL PRACTICE.—A judgment will not be reversed on the ground that a juror was not on the assessment roll, in a case where the competency of the juror was not objected to when the juror was called.

DEFINITION—PENAL CODE.—The words Penal Code mean the Penal Code of this State.

INSTRUCTION—WRITING.—In giving an instruction in a criminal case, the Court read certain sections of the Penal Code, and designated them by their numbers only. *Held*, to be compliance with the law requiring instructions to be in writing.

ID.—ID.—SHARPSTEIN, J., McKEE, J., and McKINSTRY, J., were of opinion to the contrary.

APPEAL from a judgment of conviction and an order denying a new trial in the Superior Court of Mendocino County. McGARVEY, J.

*T. L. Carothers* and *C. C. Hamilton,* for Appellant.

*A. L. Hart,* Attorney-General, for Respondent.

MORRISON, C. J.: ·

The defendant was indicted, tried, and convicted in the Superior Court of Mendocino County of the crime of murder in the first degree, and having moved for a new trial, which was denied in the Court below, he prosecutes this appeal. The grounds upon which the motion for a new trial was based were the following:

" The Court misdirected the jury in matters of law, and erred in the decisions of questions of law arising during the progress of the trial;

" 2. The verdict is contrary to the evidence;

" 3. That before a juror was called the defendant was not informed by the Court or under its direction that if he intended to challenge an individual juror he must do so when the juror appeared and before he was sworn; and

" 4. That two of the jurors who were impaneled and accepted as jurors in said case, and who constituted two of the members of the jury, were not assessed on the last assessment roll of Mendocino County, or the property belonging to them."

The second ground relied upon by the defendant, that the verdict was contrary to the evidence, will be first considered by the Court; and here it may be remarked, that there was no material or substantial conflict in the evidence.

There were but three persons present when the homicide was committed, the deceased, the defendant, and the prosecuting witness, one Nels Offer. The account given of the trans-

action by this witness is plain, straightforward, and perfectly consistent in all its details. The witness and the deceased were in the woods, chopping the timber and cleaning off a tract of land, when the defendant came up, with his gun in his hand, and engaged in an angry discussion with Richard Macpherson, the deceased, about a "wedge ax," which the defendant charged the deceased with having stolen. The account of the affair is given by the witness in the following simple language: "Harvey Mortier was speaking angry to Richard Macpherson about a wedge ax that Harvey Mortier accused him with stealing, accused him for taking a wedge ax, and Richard Macpherson says to him, he didn't do it. He says he would go to Hi Stalder and find out who took the ax. The ax belonged to a man named Hi Stalder. Well! says Harvey Mortier to him, why don't you come down now and find out who took the ax? Now, says Richard Macpherson, I won't go till this evening. He says, you had better come now. He says no, he won't. 'I will find somebody down in the woods that will put a good head on you; give you a good licking.' This last was said by Mortier to Macpherson. Macpherson didn't go down to Hi Stalder's to find out who took the ax. He remained with me chopping, and I was chopping at the time and Richard Macpherson was working with me. He started to work and Harvey Mortier (the defendant) went away, passing where we were. He went on a little, small trail. Before he left he asked me if I see any deers? I said, yes, sir. I says, I seen some deers over there in that direction; so he passes along that little trail going that way, towards that way, and I was chopping wood. Didn't pay no attention to it. In a few minutes the gun was fired and I looked and seen Macpherson and Mortier. I saw Harvey Mortier shooting. I seen the smoke and the gun in front of him, and he taking the gun down from him. He was standing in bushes that were chopped down, about two feet high. (The witness here showed the position of Mortier when the shot was fired, which was a stooping one.) I saw the smoke in front of his face, and he was trying to hide himself. Mortier was thirty-four yards from Macpherson at the time the shot was fired. I measured it the next day with a six-foot

pole. The smoke was right at the end of the gun. I saw Mortier's face distinctly and recognized him. I had known him five or six years. After the shot, Macpherson and I ran away. He ran two hundred and thirty-five steps after he was shot. We ran as soon as the shot was fired. * * * The last I saw of him he was leaning against a fence. He fell down. I then went after help to bring him home. At the time the shot was fired Macpherson was standing in front of Mortier and I was standing on one side. Macpherson was chopping a tree about six inches through. Macpherson lived about half an hour after the shot was fired." Another witness in the case, one J. C. Bunner, testified: "I examined Macpherson's body, and afterwards saw the doctor examine it. When I first saw him he was lying there covered with blood and mud. I opened his shirt and he had a bullet hole, supposed to be in his breast, about the third rib. It was a round hole, about the size of a ten-cent piece. I saw another wound, in his back, under the left shoulder-blade. It was about the same size as the wound in his breast. It was round. The wound in front was smooth, but in the back it was a little jagged—torn like. I afterwards saw the physician examine the body and probe the wounds. The wound went in at the third rib in front, broke the third rib, about where it joins the breast-bone, went through the lung, and came out just below the shoulder-blade. It was a straight wound through the body." Another witness testified to the fact that Mortier was looking for Macpherson a short time before the shooting; and a witness also testified that: "Defendant stated to me in answer to my questions that he was standing kind of sideways when he shot the deceased. I then asked him whether he killed him or not, and he said he was not sure." This is the substance of the evidence in the case, and there is, as before remarked, no substantial conflict.

It is claimed that the confession of the defendant was improperly admitted in evidence. But it was clearly a voluntary confession, and there is nothing in the circumstances under which it was made that would have justified the Court in excluding it.

It is very clear from the foregoing evidence that the case was one of murder in the first degree, and the jury could not,

consistently with a proper sense of duty, have rendered any other verdict than one of murder in the first degree.

2. The next point in the case is, that the failure of the Court to instruct the prisoner upon his rights as to challenging jurors, was error. It is true that § 1066 of the Penal Code does provide that " before a juror is called the defendant must be informed by the Court, or under its direction, that if he intends to challenge an individual juror he must do so when the juror appears and before he is sworn." The object of this provision of the law is to protect the rights of the defendant in the matter of challenging jurors. He should be informed of the fact that if he desires to challenge any particular juror, he must exercise that right before the juror is sworn; but it appears from the record in this case that the defendant's rights in this respect were fully understood by him and his counsel, and the privilege of challenging jurors was exercised to a large extent in the case. It is true that the Court omitted a duty imposed by law, but it clearly appears that the defendant was not, in any manner, prejudiced by the error complained of, and such being the case, the omission of the Court in the matter referred to, constitutes no sufficient ground for reversing the judgment. "After hearing the appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." (Penal Code, § 1258.)

3. The third point is that the names of two of the jurors were not on the assessment roll for the previous year, and therefore they were not competent jurors, under § 198 of the Code of Civil Procedure.

We have given this question a careful examination and have arrived at the conclusion that it constitutes no ground for reversal. The authorities on this point are conflicting, but it seems to us that the better reason is with the cases which hold that such an objection as the one now being considered does not entitle a party convicted to a new trial, or to a judgment of reversal on appeal. It was so held by the Court in *The People* v. *Sanford,* 43 Cal. 29. The point made in that case was that "the conviction was invalid, because not found by a competent jury. The statute requires the juror

to be assessed on the last assessment roll of his township or
county on real or personal property or both.   One juror was
on the poll tax list only."   Wallace, C. J., speaking for the
Court in that case, said: "There is nothing in the objection to
the competency of the juror.   It was the duty of the defend-
ant in the first place to have examined him as to his compe-
tency in the respect referred to at the time the jury was im-
paneled.   He does not seem to have made any objection to
his competency even afterwards, but took his trial before him
with a knowledge of the fact that his name was on the poll
tax list only, and not on the real or personal property tax list.
Having deliberately taken his chances of a favorable verdict
he can not be heard to object now that a juror of his own
choosing was lacking in a qualification of this technical char-
acter."   This is in harmony with the previous decision of the
Court in the case of the *People* v. *Chung Lit,* 17 Cal. 320, in
which it was held that "the objection that one of the jurors
was an alien could not be taken for the first time upon the
motion for new trial.   The defendants might have examined
him upon the subject and exercised their right of challenge
before he was sworn; but having failed to do this, they must
suffer the consequences of their own neglect."   In *Bristow's
case,* 15 Grattan, 648, the Court says: "It is a principal cause
of challenge to a juror that he was one of the Grand Jury
which found the indictment, but unless he is challenged be-
fore he is sworn, the objection will be considered as waived,
and his being on the jury will not vitiate the verdict.  * * *
To permit prisoners to avail themselves, after verdict, of pre-
existing objections to the competency of jurors, as a matter
of right, would not only be unreasonable, but most mischiev-
ous in its consequences.   The delays in the administration of
criminal justice and the chances for the escape of the guilty
would be greatly increased.   Proper verdicts, especially in
trials for grave offenses, would be continually set aside.   A
prisoner knowing or willfully remaining ignorant of the in-
competency of a juror, would take the chances of a favorable
verdict with him upon the jury; and if the verdict should be
adverse, would readily enough make the affidavit necessary to
avoid its effect."   In the case of *The State* v. *Quarrel,* 2
Bay, 152; S. C., 1 Am. Dec. 637, it was held that "if an

alien is drawn and impaneled as a juror, it is good cause of challenge before trial; but if permitted to be sworn by the prisoner, it is too late after trial and conviction to make it ground for a new trial." To the same effect is the case of *The State* v. *Fisher*, 2 Nott & McCord, 529, where the learned judge delivering the opinion of the Court remarks: " I can not forbear to add that if this was not the law, that I am satisfied, from my experience, that justice would be laid prostrate at the feet of offenders." This question was before the Supreme Court of Mississippi in the case of *George* v. *The State*, 39 Miss. 570, and it was there said: "Sound policy, therefore, dictates that a defendant shall not be permitted, after having had a chance of acquittal, to insist, as a ground for a new trial, upon a want of qualification in the jurors, of which he might have availed himself as a cause of challenge by using proper diligence, and such is the rule generally held in this country." In the recent case of *Kingen* v. *The State*, 46 Ind. 132, the ruling was to the same effect. The Court there say: " In *Croy* v. *The State*, 32 Ind. 384, it was held, upon a full consideration of the question, that where a defendant failed to interrogate the jurors at the proper time in respect to their being householders of the county, it was too late to make any question afterwards in that respect; and that a new trial could not be granted on the ground that one of the jurors was not a householder. We concur in the conclusion there arrived at. The defendant, as well as the State, by failing to interrogate the jury which was first sworn, as to their being householders, or taking other steps to ascertain their competency in that respect, waived any objection on that ground." And the still later case of *Gillooley* v. *The State*, 58 Ind. 182, maintains the same doctrine. See also *The State* v. *Williams*, 3 Stewart (Ala.), 454. We have examined this question at some length, because, as has already been remarked, the authorities upon the point are conflicting.

The only remaining assignment of error relates to the charge of the Court to the jury, and to it we can see no substantial objection. The principal objection to the charge made on the argument was, that the judge read to the jury the following sections of the Penal Code: 187, 188, 189, 190, 192, 194, 195, 196, 197, 198, 1096, and 1097. But which Penal

Code the record does not show. In the absence of any show-ing to the contrary, it must be presumed that it was the *Penal Code of California.* We are not aware of any rule of law which would justify the Court in presuming that it was the Penal Code of another State which the Court read to the jury. We are also of the opinion that the reading of the sections of the code was not in violation of that provision of law which requires the charge to be in writing. To make a distinction between writing and printing would be a legal refinement hardly consistent either with sound law or common-sense; and the charge of the Court to the jury would not have been rendered more certain, if the learned judge had copied the sections of the code which he read to the jury, and had then read the same sections as copied by him. But "writing in-cludes printing." (§ 7, Penal Code.) We find no error in the proceedings in the Court below, and must therefore affirm the judgment and order.

Judgment and order affirmed.

MYRICK, J., ROSS, J., and THORNTON, J., concurred.

SHARPSTEIN, J., dissenting:

I dissent. The record shows that when charging the jury the Court said: "I will try to give you what I consider the law applicable to this case. In the first place, in order to save the reporter the trouble of taking down all I may read, I would state that I propose to read from the Penal Code §§ 187, 188, 189, 190, 192, 194, 195, 196, 197, 198, 1096, and 1097. If counsel on either side desire that any other sections of the code shall be read, they will suggest it." (The Court then read the sections of the Penal Code above mentioned.)

The contents of the sections referred to are not given.

The Penal Code (§ 1093) provides that, "If the charge be not given in writing, it must be taken down by the phono-graphic reporter."

It is quite true that writing includes printing, but the numerals which we find in the record do not include any writ-ten or printed matter. They refer to a book outside of the record in which may be found something that the Court read to the jury.

The object of the provision which requires that the charge, if not in writing, shall be taken down by the phonographic reporter, doubtless is to have a complete and reliable record of all that the Judge says in his charge to the jury. In this case the reporter states that the Court read twelve sections of the Penal Code, the contents of which nowhere appear in the record. It seems to me that this constitutes error, for which the judgment and order should be reversed.

McKee, J., and McKinstry, J., concurred in the opinion of Sharpstein, J.