[Crim. No. 2845. Second Appellate District, Division One.—June 27, 1936.]

THE PEOPLE, Respondent, v. FRANK FLORES, Appellant.

Stephen J. Morris and Roy J. Farr for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Percy C. Heckendorf, District Attorney, and Martin J. Coen, Chief Deputy District Attorney, for Respondent.

WHITE, J., *pro tem.*—This is an appeal from a judgment after conviction of the crime of murder, and from orders denying appellant's motions in arrest of judgment and for a new trial.

To the charge of murdering one Louis Mock, appellant interposed his pleas of not guilty and not guilty by reason of insanity. By the verdict of the jury appellant was found guilty of murder in the first degree, with the penalty fixed at life imprisonment. Subsequent to the rendition of the verdict aforesaid, appellant regularly and duly withdrew his plea of not guilty by reason of insanity.

The evidence, in our opinion, conclusively shows that on the 11th day of October, 1935, the appellant shot and killed Louis Mock. The evidence indicates that on the date of the homicide, and for some months prior thereto, the appellant was occupying a room in the home of the deceased in Santa Barbara County; that appellant and deceased had been acquainted for several years, and prior to October 11, 1935, had worked together as general ranch hands. On the evening preceding the killing it appears that the deceased, his wife, appellant, Mrs. Frances Ontiveros, and the latter's daughter, Mrs. Amparito Ontiveros, relatives of Mrs. Mock, were visiting in the home of deceased, along with one John Franzini. During the course of the evening Mr. Franzini and appellant left the house, and returned a short time later with two half-gallon jugs of wine. Some drinks of wine were served, but no one appears to have become intoxicated, nor is there any evidence of any quarrel or acrimonious discussion among those present. The record indicates that the deceased and his wife retired before the guests, and that about 11 o'clock Mr. Franzini left, the appellant retired to his room, and Mrs. Ontiveros and her daughter went to bed.

The following morning, October 11th, about 8 o'clock, Mrs. Mock went to the kitchen to prepare breakfast, and at that time saw appellant, who came into the kitchen and got a jug of claret wine. About that time Juan Grijalva, of Santa Ynez, and a friend of appellant, came into the kitchen of the Mock home to see appellant. The latter served Grijalva two glasses of wine, and he himself drank a like amount. At that time Mrs. Mock left Grijalva and appellant alone in the kitchen. The witness Grijalva testified that appellant asked him if he had a gun, to which Grijalva replied in the negative. Shortly thereafter Grijalva left the kitchen and returned to his home. In a short while Mrs. Mock returned to the kitchen and continued with the preparation of breakfast. The deceased, Mrs. Amparito Ontiveros, Mrs. Frances

Ontiveros, and appellant all came into the kitchen about that time, and appellant began to complain to them that on the previous night, after 11 o'clock, he had gone to the home of a friend of his, Charles Ontiveros, where he had been denied admittance. The deceased told appellant that it was no time for him to be visiting at that late hour, advising him to forget it and eat some breakfast. Appellant refused to have any breakfast, and declared he would not stay in that house as it seemed to him he was not wanted. The deceased again urged appellant to eat breakfast and forget about the matter, but appellant left the kitchen. Mrs. Amparito Ontiveros, Frances Ontiveros and deceased went into the dining room, which adjoined the kitchen, and seated themselves at the table preparatory to eating breakfast. Mrs. Mock, who was serving breakfast, had just started into the dining room with a pot of coffee in her hand, when she observed appellant standing beside the bed in the bedroom of deceased and saw him take a .32-caliber Colt automatic pistol from a holster which was lying on the table beside the bed and walk out of the bedroom towards the front of the house. Stepping into the dining room, Mrs. Mock said to her husband, "He took the pistol," whereupon Mr. Mock got up from the dining room table and went towards the front of the house, through the kitchen, through the bedroom which appellant had just left, through the hall, into the living room, and out the front door. Mrs Mock and the others in the front part of the house heard the deceased walking rapidly through the house and heard the front door slam, followed a few seconds thereafter by the sound of a shot, and the voice of appellant saying, "You are dying, huh?" and then immediately the sound of a second shot. The three women thereupon rushed to the front of the house by the same route taken by appellant and the deceased, and when they arrived at the front door they saw the deceased lying on the front porch. All the doors separating the various rooms through which the deceased walked and through which the three women followed were standing wide open, and the ladies testified that there had been no scuffling of any kind, nor did they hear any conversation between deceased and appellant in the house on the way out. After observing the deceased lying on the front porch, Mrs. Mock collapsed, and was taken into the house. Mrs. Amparito Ontiveros, however, testified she noticed appellant standing

diagonally across the street, and also observed the next-door neighbor, Joe Calderon, and Modesto Monte, a visitor, standing in front of the former's house, which adjoins that of the deceased. At that time, she testified, she heard appellant say to the two men, "I killed the son-of-a-bitch. Go pick him up." In this statement the witness was corroborated by the neighbor, Mr. Calderon, while Mr. Monte, who was standing near Calderon, testified he heard appellant say, "Calderon, I killed a man. Go pick him up. I shot him. He is shot."

What happened between appellant and deceased after the latter followed the former out of the house was observed by the witness Juan Grijalva, the friend of appellant, who at the time was standing near the front porch of Calderon's house. He testified that he saw deceased and appellant come out of the former's house, walking side by side; that they were walking out towards the gate; that they walked out to about the center of the grapevine arbor when the witness heard two shots; that the two men separated, the deceased going towards the porch, while appellant stood there a moment with an object in his right hand. The witness was unable to identify the object, and testified that appellant had his coat over his left shoulder. This witness further testified that immediately following the shooting appellant exclaimed, "You will follow me!" This witness was only about 85 feet from the men when they walked out of the house, and was very definite in his statement that they were not fighting or wrestling, but were walking side by side towards the gate leading to the street. The evidence further indicates that shortly after the homicide appellant came into the lunchroom of E. C. Craig on the main street of Santa Ynez, and obtained from Craig a pint bottle of Old Quaker whiskey. Craig testified that at that time appellant was sober. Appellant was next observed at the house of Mrs. Virginia Ontiveros, mother of the estranged husband of Mrs. Amparito Ontiveros, in the northwesterly part of Santa Ynez. It was to this home that appellant had gone the night before and at which house he had been denied admittance. Mrs. Ontiveros stated she heard appellant say that he had shot Mr. Mock with his own gun when the latter tried to kill him. This witness also secured the gun from appellant which he had taken from the bedroom of Mr. and Mrs. Mock. Upon

being notified of the homicide, Constable Crabb traced the appellant to the home of Charles Ontiveros, where he found the appellant seated on the running-board of a car in the rear of the house. When the constable placed appellant under arrest the latter said, "All right. I do not care if they put a rope around my neck or not." Appellant further told the constable that he had secured the gun from the bureau of the Mock home. Later appellant changed his story, and told the constable he had taken the gun away from deceased during a struggle. The constable obtained the .32-caliber automatic pistol from Mrs. Ontiveros, to whom appellant had previously given it, and also relieved appellant of the bottle of Old Quaker whiskey, from the contents of which appellant had consumed one-half. The constable testified that at the time he arrested appellant the latter was sober, but by the time the deputy sheriffs arrived from Santa Barbara appellant was under the influence of liquor. During the conversation with the deputy sheriffs who had come from Santa Barbara, appellant appeared to be intoxicated, and later when examined by a physician was found by the latter to be under the influence of liquor. However, the doctor stated that in his opinion appellant could have become intoxicated as a result of the whiskey which he had consumed after he left the Mock home following the shooting. Later on the day of the shooting, after being lodged in the county jail at Santa Barbara, appellant had a conversation with Deputy Sheriff Ross, in which appellant stated that the deceased had become angry with him for going over to the home of Teddy Ontiveros the previous night, and that deceased started to get his gun, but that appellant got the gun first, and that the two of them struggled over it. Appellant stated he shot Mr. Mock while they were still in the house. The day following, appellant was further questioned by a deputy district attorney in the presence of deputy sheriffs, and his statement was taken down in shorthand. In that statement appellant related that on the previous night, after the others had gone to bed, he went to the home of Teddy Ontiveros, but was refused admittance, whereupon he returned to his room at the home of deceased, and went to bed. He stated that the next morning, when he got up, he went to the kitchen, and was telling Mr. Mock about what had occurred the night previous. He said that the deceased became violently angry at him

for going over to the Ontiveros house the night before, and started to get his gun in the bedroom. Appellant claimed he followed Mr. Mock into the bedroom, and when the latter took hold of the gun appellant threw his arms around Mr. Mock, standing in back of him, and grabbed onto the gun; that the two of them then wrestled around the bedroom, out into the hall, through the living room, out across the porch, and down the steps. Appellant said that he kept his hands on the gun all the time, and after they had reached the ground in front of the porch they fell down twice, and that it was at this time that the gun went off twice. Appellant claimed that he did not know where the bullet struck Mr. Mock, but said Mr. Mock released his grasp on the gun after the second shot, staggered to the porch, where he hung onto the railing for a few moments, and then slumped to the floor. Appellant further stated that he was not intoxicated at the time of the shooting, but became so after he had consumed the whiskey which he obtained after the shooting was over. This was amplified by the testimony of the appellant at the trial, wherein he testified that he saw deceased go to the latter's room and reach for his gun. Appellant further testified that the deceased had stated once on the morning of the fatal shooting that he was going to kill appellant, and accused appellant of communicating with Mr. Ontiveros about some family affairs. Appellant denied saying, ''I killed the son-of-a-bitch,'' and claimed that when he hollered to the witness Calderon he said, ''I thought Mr. Mock was shot. Please come and see Mr. Mock.'' Appellant admitted in his testimony at the trial that he knew deceased kept his gun on a little stand in the bedroom, and was further aware of the fact that the gun was already loaded.

Appellant assails the judgment on the ground that the evidence is insufficient to sustain the verdict of murder in the first degree, but in our opinion, a mere reading of the foregoing epitome of the testimony, made up from a reading by us of all the evidence adduced at the trial, at once indicates that while a conflict appears as between the testimony of the several prosecution witnesses and the happening as narrated by appellant, if the jury believed the testimony of the People's witnesses, as they evidently did and had a right to do, such testimony was of sufficient substantiality to support the verdict rendered. Reviewing judges are obviously in no

position to determine the credit which should be accorded to witnesses or to weigh their testimony. Undoubtedly for that reason our Constitution provides that the appellate courts are not authorized to review evidence, except where, on its face, it may justly be held that it is insufficient to support the ultimate issue involved, in which case it is not a review of a question of fact, but purely one of law. (*People* v. *Haydon*, 18 Cal. App. 543, 553 [123 Pac. 1102, 1114].) Carrying out the spirit and intent of this constitutional provision, the legislature has ordained that the jury are the exclusive judges of the credibility of witnesses (Code Civ. Proc., sec. 1847), and are the judges of the effect and value of evidence addressed to them, except in those instances where it is declared by law that it shall be conclusive. (Code Civ. Proc., sec. 2061.) It necessarily follows from the rules just noted that the jury in this case were authorized, if they conscientiously felt warranted in so doing, after full and fair consideration thereof, to reject the testimony of the defendant and to accept evidence in contradiction thereof.

In addition thereto, we must remember that a motion for a new trial was made in this case and denied by the trial court. The judge of that tribunal had the witnesses before him, was fortified with an opportunity to observe their manner and demeanor on the stand, and apparent candor or lack of the same, and the reasonableness or unreasonableness of the stories they told. In denying the motion for a new trial, the lower court concurred in the action of the jury, which rejected defendant's version of the fatal encounter and believed the testimony adduced showing that the killing was wilful, unlawful, felonious and with malice aforethought. It might also here be observed that the jury's action in disregarding defendant's evidence finds some support and corroboration in the statements of the defendant, as above set forth, made at the time of and subsequent to his arrest, together with the improbability of appellant's claim that the gun was discharged both times during the scuffle, when viewed in the light of the testimony of the ballistics expert, Spencer B. Moxley, to whom was delivered a section of the tissue surrounding the wound in the left breast of the deceased, which tissue was removed from the body, and from a chemical and microscopic examination of which the expert testified it was powder-burned and torn from the pressure of the gases

from the powder of the gun, indicating definitely, according to the expert, that the gun had been pressed tightly against the breast of the deceased at the time it was fired. The testimony also shows that the wounds in the leg indicated that the one on the outer side was the point of entrance and the one on the inner side was the point of exit, the bullet having gone downward and inward. Examination of the entrance hole in the leg of the overalls which deceased was wearing disclosed that there were no powder burns on the fabric. According to the ballistics expert, this indicated very definitely, in the light of tests made by the witness, that the gun had been held at a distance of more than 36 inches from the leg at the time it was fired. Added to this we have the testimony that immediately after the second shot was fired appellant was standing under the grapevine arbor in the front yard of deceased's home, with the gun in his hand and with his coat swung over his left shoulder. This of itself would warrant the jury in inferring that had appellant been engaged in a struggle, as he contends, which continued from the bedroom to the front yard, during which appellant and deceased fell or stumbled twice, appellant would not have had his coat resting undisturbed upon his left shoulder. The state of the evidence in the record before us is such that the finding of the jury thereon is conclusive.

Appellant next contends that the evidence shows that he was intoxicated, and that becouse of such intoxication the crime, if any was committed, could be no greater than manslaughter. Voluntary intoxication never becomes available as a defense for crime, and is only material when the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, in which event the jury may take into consideration the fact that the accused was intoxicated *at the time,* in determining the purpose, motive or intent with which he committed the act. (Pen. Code, sec. 22; *People* v. *Clifton,* 186 Cal. 143 [198 Pac. 1065] ; *People* v. *Burkhart,* 211 Cal. 726 [297 Pac. 11] ; *People* v. *Keyes,* 178 Cal. 794 [175 Pac. 6] ; *People* v. *Belencia,* 21 Cal. 544.) While there is in the record evidence to the effect that appellant was under the influence of liquor some time after the homicide, nevertheless, the jury was warranted in concluding that such intoxication was the result of the consumption by appellant of

the whiskey obtained by him at Craig's store after the shooting. In fact, appellant himself testified before the jury as follows:

"Q. You were sober when you were over there at the house, weren't you?

"A. Yes, I was sober.

"Q. You knew everything that went on there?

"A. Yes.

"Q. It is very clear in your mind?

"A. Yes."

Also, in this regard, the jury was fully and correctly instructed on the question of intoxication.

■ Appellant next contends that the court erred in the giving and refusing of certain instructions. We have examined and scrutinized the instructions called to our attention, and have considered the charge to the jury as a whole; and we are satisfied that no prejudicial error has been committed. (Art. VI, sec. 4½, Const.; *People* v. *Bealoba,* 17 Cal. 389, 395; *People* v. *Fleming,* 218 Cal. 300, 310 [23 Pac. (2d) 28]; *People* v. *Hatch,* 163 Cal. 368 [125 Pac. 907]; *People* v. *Ruef,* 14 Cal. App. 576, 613 [114 Pac. 48, 54]; *People* v. *Buckley,* 143 Cal. 375 [77 Pac. 169]; *People* v. *Northcott,* 209 Cal. 639 [289 Pac. 634, 70 A. L. R. 806]; *People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609]; 8 Cal. Jur. 314; *People* v. *Rowland,* 207 Cal. 312 [277 Pac. 1041].)

■ Appellant complains of the court's action in rereading certain instructions. In this connection, the record discloses that the jury brought in a verdict as follows: "We, the jury in the above-entitled cause, find the defendant, Frank Flores, guilty of murder in the first degree, and fix his punishment at confinement in the state prison for life, without parole." The surplus words, "without parole", were added to the verdict by the jury, and were in the handwriting of the foreman, and it is apparent from a reading of the transcript that the court reread the instructions with reference to the forms of verdict for the sole purpose of clarifying the jury's duty with respect to the form of any verdict, so that such verdict as they might bring in would not contain the additional words, "without parole". We find no merit in appellant's contention that the rereading of these instructions manifestly impressed the jury with the guilt of the defendant, because the jury, at the time the court reread

the instructions, had already decided that the defendant was guilty, and we cannot assume that during their deliberations which resulted in that verdict they did not take into consideration all of the court's instructions. The instructions reread had only to do with the possible verdicts that could be rendered and their proper form, and in no way indicated that a verdict of guilty should be returned. In this procedure there was no prejudicial error.

Appellant next contends that the court erred in refusing to grant his motion for a new trial, and as a ground therefor asserts that appellant was not familiar with the use of the English language and should have been given the opportunity of presenting his testimony in the Spanish language through an interpreter. We have no hesitancy in saying that the clarity, coherency, understandability and intelligence of appellant's answers to questions propounded to him convinces us that he possessed an adequate understanding of the English language and was conscious of the meaning and import of questions addressed to him and of the effect of his answers given thereto. It might also be observed that the record indicates that appellant was born in the county of Santa Barbara in this state, and has lived in a community of English-speaking people practically all of his 54 years of life. Also, counsel for appellant made no request for an interpreter at any time during the trial. This question cannot be raised for the first time on appeal.

Appellant's next complaint deals with the challenge to the jury panel made at the time the case was called for trial, and with the affidavit concerning the jury panel filed at the time of his motion for a new trial. The challenge to the panel included as grounds therefor the allegation that the selection and returning of said jurors was in violation of the provisions of sections 204 to 211 of the Code of Civil Procedure, and that the drawing of the jury was in violation of the provisions of sections 214 to 220, inclusive, of the Code of Civil Procedure, and that the "summoning" of said jurors was in violation of the provisions of sections 225 to 228, inclusive, of the Code of Civil Procedure. It also included allegations that the selection of the panel and jurors was "made and done in a material departure from the forms prescribed in respect to drawing and return of jurors"; and "that there was an intentional omission of the sheriff to

summon one or more of the jurors drawn''; and further, ''that the officer or officers in the selection and selecting of the panel and venire were prejudiced''. The challenge included all possible grounds for a challenge to the panel, but failed to point out wherein there was a violation of the provisions of the Code of Civil Procedure, or wherein there was any omission by the sheriff in the summoning of one or more of the jurors drawn, or which officer or officers were prejudiced, and upon what basis that prejudice rested for support. So far as the record before us discloses, the appellant made no offer to prove, nor did he attempt in any manner to present to the court, anything to substantiate the grounds of his challenge. Obviously, there was nothing presented to the court, nor was there any showing made, upon which the court could do other than deny the challenge, and its action in this regard was proper.

At the time of the hearing of the motion for a new trial, counsel for appellant filed an affidavit based upon a printed article which appeared in a publication known as ''Town Talk'', printed in the city of Santa Barbara, in which publication charges of irregularity in the impanelment and length of service of trial jurors in Santa Barbara County were made. At the time of the presentation of this affidavit there was no offer of proof, nor was there any effort made to present to the court anything that would substantiate the statements contained in the newspaper clipping; and further, appellant exercised no challenge to the individual jurors on the ground that they were precluded from serving by reason of the provisions of sections 199 and 200 of the Code of Civil Procedure. Having failed to interpose any such challenge to the individual jurors, if in fact there were any grounds for such a challenge, appellant cannot raise the question for the first time on appeal. (*Livesey* v. *Stock*, 208 Cal. 315 [281 Pac. 70], citing *People* v. *Mortier*, 58 Cal. 262; *People* v. *McFarlane*, 138 Cal. 481 [71 Pac. 568, 72 Pac. 48, 61 L. R. A. 245]; *People* v. *Boren*, 139 Cal. 210 [72 Pac. 899].)

Assuming that appellant interposed a challenge to the panel on the ground that it was a special venire, although the record does not disclose that such a challenge was made, we are nevertheless of the opinion that the court's action in this regard was without prejudicial error; and at the time

the order was made for a special venire of 50, the appellant was in court with his counsel, and no objection was interposed to the special venire, nor was any demand made for a drawn jury. The law is well settled in California that the court has discretion to order a special venire, as provided in section 226 of the Code of Civil Procedure, notwithstanding the fact that there are sufficient in the trial jury box. (*People* v. *Suesser,* 142 Cal. 354, 360 [75 Pac. 1093] ; *Estate of Wall,* 187 Cal. 50, 54 [200 Pac. 929] ; *Perkins* v. *Sunset T. & T. Co.,* 155 Cal. 712, 715 [103 Pac. 190] ; *People* v. *Durrant,* 116 Cal. 179, 195 [48 Pac. 75] ; *People* v. *Vincent,* 95 Cal. 425 [30 Pac. 581].)

Even assuming that there were irregularities in the summoning of a special venire, section 4½ of article VI of the Constitution is applicable, and will apply if, after examination of the entire record, including the evidence, it appears, as in this case, that a miscarriage of justice has not resulted therefrom. (*People* v. *Stennett,* 51 Cal. App. 370, 398 [197 Pac. 372].)

Other points raised by appellant do not require discussion.

The attempted appeal from the order denying appellant's motion in arrest of judgment is dismissed, for the reason that the record discloses that no such motion was duly and regularly filed, nor argued or presented to the trial court.

Being of the opinion that appellant was fairly tried and justly convicted, the judgment appealed from and the order by which appellant's motion for a new trial was denied are, for the foregoing reasons, affirmed.

York, Acting P. J., and Doran, J., concurred.