[Civ. No. 7860. Third Dist. Feb. 23, 1951.]

NATALINA NEGRA, Respondent, v. L. LION & SONS COMPANY (a Corporation), Appellant.

454

Campbell, Hayes & Custer and Edward J. Niland for Appellant.

C. Ray Robinson, R. A. McCormick and Margaret A. Flynn for Respondent.

VAN DYKE, J.—Plaintiff and respondent, with her husband, is a resident of Los Banos. For about six years they had occupied a residence, the floor plan of which, so far as material here, may be described as follows: The living room was 13 x 21 feet. Near the southeasterly portion thereof a 4-foot open archway gave entrance to the dining room, which measured approximately 12 x 12 feet. Across the dining room French doors gave exit to a rear porch. Beneath the dining room there was a floor furnace, the metal grating over which formed part of the floor surface. The grating measured approximately 20 inches in the square. It was located 6 inches from the southerly portion of the open arch. Just prior to July 29, 1948, respondent had purchased carpeting for her home from defendant and appellant and on the morning of July 29th two of appellant's employees arrived with the carpet, prepared to lay it in the living room and dining room and in a rear hall just south of the dining room. They first laid the carpet in the living room, and having completed that task they next moved into the dining room. In order to lay the carpet in the dining room it was necessary to remove the grating over the floor furnace, tack the carpet down around the hole, cut around the hole with a knife, then replace the grating so that its exterior edges would extend over the carpet immediately around the hole. The workmen informed respondent and her husband that the grating had to be taken off in order to lay the carpet and respondent testified that she knew the grate had been removed for that purpose. After the grate had been removed there was some talk about cleaning out the floor furnace while the grate was off, and some little time later the workmen called to respondent, saying that if she would "come and vacuum it, the floor furnace, that they were ready to put the grate back on again." Respondent said that she immediately left her work, came into the dining room with the vacuum cleaner and vacuumed the lint out of the furnace cavity and then went back into the living room where she was engaged in putting that room in order. She further said that when she had finished cleaning around the floor furnace with the vacuum

cleaner she went back into the living room without looking around the dining room to see how far the work of laying the carpet had progressed. An interval of time, fixed by the testimony as 10 or 15 minutes or possibly longer, elapsed. It appears that in order to properly lay the carpet it was further necessary to remove from its hinges the door leading into the back hall. This was done by one of the men and he carried the door up approximately to the archway where he spoke to respondent, indicating his intention to place the door in the living room. As respondent said, "He said, 'what shall I do with this door, shall I put it into the living room?'" Respondent, when spoken to, looked toward the workman and saw him standing with the door in his arms, with one end approximately at the southerly frame of the arch and the rest extending diagonally into the dining room in such a position as to obscure from her view the rest of the dining room, including the point where the grate was off the floor furnace. Respondent, seeing him so standing with the door under his arm, told him not to bring it into the living room because she had cleaned up in there, but to put it on the back porch where it would be out of the way. She then described what happened as follows: "So he hesitated with the door, not knowing what to do with it, looking in different directions and so I saw that he wasn't sure where the back porch was, so I said, 'I will open the door for you,' and I pointed toward my back doors and he still hesitated so I started forward and as I stepped forward he saw that I was trying to get across and he tried to clear a road for me to get through or something, when as I took that second step back, it wasn't still clear, and as he cleared the view it was too late, I was going into the furnace then, by the time he cleared the view I was falling in." Again she said, "Because he looked toward the kitchen and around and I pointed toward the doors [the French doors to the back porch] and he still hesitated, so I says, 'I will open them for you' and then as I stepped forward and tried to get across, then he still hesitated and then I took a step to the left and as I took that step to the left he finally noticed that I was trying to get across there and he started moving that door, my leg—I was already taking that other step as the view cleared, my leg was going in there. And I still tried to grab for the door but it was too late." She was asked if she looked where she was going and answered, "Well, I didn't feel like I should because he said that they were ready to put that grate back when I got through vacuuming. . . .

Well, as I walked, all I could see was that door in front of me. . . . I was looking at his face when he was talking to me and I was talking back at him. . . . Q. And you were not watching where you were walking, isn't that correct? A. Why, no. . . . I wasn't watching, naturally walking, that floor there was nothing to watch, it was a level floor. Q. . . . But a few minutes before you had seen the grille off, had you not? A. But they said they were putting it back on and I took it for granted that it was back on. . . . Once they tell me that the grille is going to be put back immediately and I was in the room [the living room] about, at least 10 minutes, I just forgot it because I took it for granted that it was back on there. . . . I don't mean forget it, I just took it for granted that the grille was back on there, there was nothing to be thinking about.'' It further appears that the workmen, having moved into the dining room to lay the carpet there, had been working there for quite some time before respondent cleaned out the furnace opening. The evidence is quite conflicting as to just how far the work of laying the carpet had progressed, but it appears without conflict that the two men were still working there when the accident happened.

A jury returned a verdict in favor of respondent in the sum of $30,000 for the injury she received and from the judgment entered thereon this appeal was taken.

Appellant contends that the evidence is insufficient to establish any negligence on the part of appellant's employees and that as a matter of law respondent herself was contributorily negligent. Appellant further contends that the damages awarded are not supported by the evidence and are grossly excessive. Finally, appellant contends that the court committed reversible error in overruling defendant's objection to the method used in selecting a special venire which was ordered in when the regular panel had been exhausted.

In support of these contentions, appellant argues, first, that the removal of the grate was not in itself an act of negligence, since it was necessary and appropriate to the proper performance of the work of laying the carpet. This point is not, and we think could not be, controverted by respondent. Next, appellant says that since respondent knew the grate had been removed and the reason for its removal, she had full knowledge of the existence of this obvious danger to anyone walking across the floor in the vicinity of the opening and that no duty was cast upon them to warn her when she walked

toward that opening that the grate had not been replaced. They point out they did not request her to enter the room; that she walked into it of her own volition; that notwithstanding the door in the arms of the workman temporarily obscured her vision, she went forward and just as the obstruction to her vision cleared and without looking where she was placing her foot she stepped into the opening. They argue that the workmen's statement, when they called her into the room to clean the furnace, that they were then ready to put the grate back on, was not an assurance that, within the short space of time elapsing, they would at once replace it and did not justify her assumption that they had put the grate back on and her further assumption that it was therefore safe for her to walk across it without looking to see if it was in fact there; that there was by the circumstances detailed above nothing requiring them when she entered the room to give her further warning than was afforded by her previous knowledge the grate had been removed and of the reason for its removal, or do anything to prevent her progress into the opening. They point out what is the undisputed fact that the opening was so close to the entrance to the dining room as to require but a single step to reach it.

 Generally speaking, the degree of care required under any given circumstances and the question as to whether or not that degree was attained by one charged with negligence is a question of fact for the jury and not a question of law. (*Malone* v. *Clemow*, 111 Cal.App. 13 [295 P. 70].) Negligence of a defendant, like contributory negligence of a plaintiff, is generally a question of fact for the determination by the trier of fact whose finding will not be disturbed on appeal if there is substantial evidence to support it. (*McWane* v. *Hetherton*, 51 Cal.App.2d 508, 511 [125 P.2d 85].)

In defense of the judgment on the question of appellant's negligence, respondents advance the following argument: They say the negligence lay: a. In failing to replace the grate as the workmen said they were ready to do, and leaving the opening in the floor unguarded; b. In failing to warn respondent as she was about to enter the room that they had not replaced the grate and that the opening was unguarded; c. In holding the door so as to obstruct respondent's view.

We think respondent's counsel have made the only charges of neglect that could be made under the circumstances of this case. If there was negligent conduct toward respondent it must have begun after, having cleaned out the furnace,

respondent left the dining room, for there is and could be no contention that the removal of the grate was not an act required in the performance of the work, done with respondent's full knowledge. If there was negligence, then it must have begun when the workmen told respondent they were ready to put the grate back in, resulting, as she testified, in the creation of an impression in her mind, after the lapse of 10 or 15 minutes, that the grate had been replaced and that she could, therefore, move about her home with her accustomed freedom. It appears that the grate, in place, was a part of the flooring designed for and reasonably adapted to general floor usage, including walking upon it, with no more reason to look at that spot before stepping on it than there would have been as to any other portion of the floor.

We must, of course, consider and accept the evidence which supports the judgment. We have, then, the following factual situation: Appellant's workmen had removed the grate which was a part of the flooring of the dining room. This created a situation dangerous to anyone stepping from the living room into the dining room near the southerly margin of the open arch between the rooms. They informed respondent of that fact and of the reason for the removal of the grate and that it would be replaced at some time during their operations; when she cleaned the furnace they told her it was an appropriate time for her to do so because they were ready to replace the grate immediately. They did not replace it. The workman then carried the door into such a position as to obscure the view into the dining room from the living room. He then asked where to put the door and if it could be placed in the living room. She asked him to place it on the back porch which was across the dining room. While the door was being so held she approached the archway. The workman began moving the door to enable her to enter the dining room, as was her apparent intention expressed by the words "I will open the doors for you." He did not warn her that if she followed her apparent path she might step into the hole past the end of the door he was moving out of her way, although it was reasonably apparent to him she intended to walk there and that she was apparently oblivious of the danger confronting her. We think that the foregoing statement is within the limits of the testimony and that the jury so believing the facts and drawing permissible inferences therefrom could justifiably find that this course

of conduct was negligent. We hold, therefore, upon this branch of the case that the judgment is supported by the evidence.

Coming now to the contention of appellant that respondent was guilty of contributory negligence as a matter of law, we find appellant urging that respondent was not entitled to walk without looking when she knew that the grating had once been removed; that she could not, as a reasonably prudent person assume that in the interval of time between their statement to her that they were ready to replace the grate immediately and her act of walking into the dining room they had, in fact, replaced the grate. Appellant argues that the hole in the floor was an obvious danger, easily seen if looked at and that respondent cannot square her conduct in not looking before she stepped with the standard of reasonable care. We think it must be conceded that, in view of the situation presented by this record, the question of contributory negligence is a close one. ■ But we do not think that the implied finding of the jury that respondent was not guilty of contributory negligence can be said here to be without support in the evidence. Little more need be said than has been said while discussing the question of appellant's neglect. Respondent was in her own home. True, the workmen were also within it and were engaged in their work in the dining room where the danger lay. But people walk about their homes with such a sense of familiarity as to justify some relaxation from the care reasonably required when walking in strange places and we think the jury could find that, under the circumstances here, her assumption that the grate had been replaced, coupled with the omission of the workman as he stood holding the door in front of the hole in the floor to give any warning in the face of her expressed intention to step into the room, was reasonably careful conduct on the part of respondent.

As to the claimed excessiveness of the verdict, we think little need be said. ■ In the beginning it is appropriate to restate the well-established rule that a jury's verdict cannot be disturbed on appeal, unless so disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion and prejudice. (*Potter* v. *Empress Theatre Co.,* 91 Cal.App.2d 4, 13 [204 P.2d 120].)

■ Respondent received a cut in the knee, resulting in a muscular injury, followed by atrophy and the wasting away

of the muscle tissue. An expert witness testified that the musculature involved would probably never return to normal. She received also a nerve injury and the same expert said that the nerves would never regenerate. This witness also said he was positive that a future operation would be necessary and that it would consist in removal of the kneecap; that respondent was bedridden for four months with the leg immobilized for that time; that muscular activity had been very slow in returning because she was not able to use the leg on account of pain; that the consequential favoring of the injured leg resulted in the hip rising so as to throw the pelvis out of position and cause backaches and joint aches in the hip; that the nerve and blood vessels severed were impossible of repair and respondent will be partially incapacitated and suffer pain for the rest of her life. She had suffered more than a thousand dollars special damages to the time of trial and would have to undergo further expense in an effort to repair the damaged member. There was testimony that she would never regain the full, normal use of her leg; that she had worked in a department store, which necessitated standing, and in contrast was still unable at the time of trial to do parts of her housework and was unable to stand for any long period without pain; that the continuing pain from her injury still kept her awake at nights. A motion for new trial upon the ground, among other grounds, of excessiveness of damages, was made and denied by the trial court. We think it apparent from the foregoing that the verdict cannot be disturbed here on the ground of its being excessive.

Appellant contends further that the trial court committed error in the matter of selection of the special venire. The following occurred: Twenty-four persons responded to the general venire summons. Ten were excused for cause, eight were challenged by one party or the other and excused. The original panel was thus exhausted, with six people in the jury box. The court ordered a special venire. A deputy sheriff returned a special venire of 10 persons. He testified upon interrogation by counsel for the appellant that he had by telephone requested the attendance of these persons; that they all lived within the city of Merced, except two, who lived outside those limits and within the township which includes Merced; that he obtained the names by reference to a list of people whom he knew were willing to serve as jurors, which list he kept and which contained seven or eight hundred names. He made up the list, he said, by asking

jurors who had served if they were willing to serve again on call and if they said they would be so willing he put their names on his list; that when he got orders to summon a special venire for a jury trial he called people on this list, since in such a situation he was rushed and using the list was the best he could do; that to get the 10 people he had caused to appear he had called 42 persons on the list, starting at the top and going along until he got 10, which was the number required by the court's order. He concluded by stating that "there is no other way in God's world in an hour or two to get this amount of people." Counsel for the appellant thereupon challenged the special venire upon the ground that it had not been called from the body of the county, but came in fact from the city of Merced and the township which includes the same. Section 227 of the Code of Civil Procedure provides:

"When there are not competent jurors enough present to form a panel the court may direct the sheriff . . . to summon a sufficient number of persons having the qualifications of jurors to complete the panel, in superior courts from the body of the county, or city and county, in municipal courts from the body of the city, or city and county, and not, in either case, from the bystanders."

It is not, and could not be, contended here that the special venire were summoned from bystanders. But it is claimed that to summon a special venire from a single township within a county is to fail to comply with the mandate of the statute that they be summoned from the body of the county. The case of *Livesey* v. *Stock*, 208 Cal. 315, 321 [281. P. 70], is pertinent. We quote the following:

"The presence of illegality respecting the impaneling of a jury in the civil cause is never a jurisdictional question, but it is, at most, but error in the exercise thereof. (*Amos* v. *Superior Court*, 196 Cal. 677 [239 P. 317].) A challenge leveled at the panel is not contemplated by the statute in civil cases. The remedy allowed is a challenge to the individual juror. (Sec. 601, Code Civ. Proc.; *Estate of Wall*, 187 Cal. 50 [200 P. 929].)

"The general objection here made to the panel amounted to no more than a challenge thereto. Moreover, the error was at most but technical, for under sections 204 and 206 of the Code of Civil Procedure, a regular panel for the Long Beach Superior Court would have consisted of persons selected 'from the names of men and women residing within the township within which said city is located.' While sections

226 and 227 do not contain a similar provision, still directing the sheriff to remain in a given township while seeking a special venire, so long as they were not taken from bystanders, would seem to be a matter of small consequence.''

Also in *People* v. *Flores*, 15 Cal.App.2d 58 [58 P.2d 1311], where irregularities were claimed in the summoning of a special venire, the court stated, page 71:

''Even assuming that there were irregularities in the summoning of a special venire, section 4½ of article VI of the Constitution is applicable, and will apply if, after examination of the entire record, including the evidence, it appears, as in this case, that a miscarriage of justice has not resulted therefrom. (*People* v. *Stennett*, 51 Cal.App. 370, 398 [197 P. 372].)''

█ It was not contended in the trial court, and is not here, that the deputy sheriff summoning the special venire was himself either prejudiced or biased or that he acted from improper motives, nor did the trial court in its order direct that the special venire be summoned from any particular part of the county. What the officer did appears clearly to have been dictated by the practicalities of the situation. He was given about two hours to bring a special venire before the court and no objection was made by either side to this limitation of time. Under the circumstances we conclude that no such irregularity existed as to call for criticism and certainly not for reversal of the judgment.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied March 16, 1951, and appellant's petition for a hearing by the Supreme Court was denied April 19, 1951. Schauer, J., voted for a hearing.